**UNITED STATES of America, Appellee,**

v.

**Carlos Ruben ACOSTA–COLON, Defendant, Appellant.**

**No. 97–1170.**

United States Court of Appeals, First Circuit.

Heard May 6, 1998.

Decided Oct. 5, 1998.

Rachel Brill for appellant.

José A. Quiles–Espinosa, Senior Litigation Counsel, with whom Guillermo Gil, United States Attorney, Nelson Peréz–Sosa, Assistant U.S. Attorney, Warren Vázquez, Assistant U.S. Attorney, and Camille Vélez–Rivé, Assistant U.S. Attorney, were on brief, for appellee.

Before STAHL, Circuit Judge, CYR, Senior Circuit Judge, LYNCH, Circuit Judge.

STAHL, Circuit Judge.

A dog-sniff at the San Juan international airport alerted authorities to the possible presence of narcotics in four suitcases checked on a domestic flight to New York City. Based on information that indirectly linked defendant Carlos Ruben Acosta–Colon ("Acosta") to these bags, three law enforcement officials stopped Acosta and two persons traveling with him as they attempted to board the flight. At issue in this appeal is the constitutionality of the ensuing thirty-minute detention that led to Acosta's formal arrest. Conceding that Acosta was stopped on the basis of suspicion short of probable cause, the government contends that the detention was nevertheless reasonable under the circumstances and fell within the parameters of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The district

court agreed and denied the defendant's motion to suppress. We now reverse.

### I.

The following facts are not materially disputed. At about 11 a.m. on November 3, 1995, a canine narcotics unit working at the Luis Muñoz Marin Airport in Puerto Rico alerted an agent of the United States Customs Department to the odor of drugs in four American Tourister suitcases that had been checked on an American Airlines flight scheduled to depart for New York City at 1 p.m. Two of the four bags had identification tags bearing the name of Miguel Morales; the other two had tags showing the name Jesús Lebrón. Customs officers immediately seized all four pieces of luggage and transported them to what the government describes as the airport's "customs enclosure area."

A supervisor in the customs office then requested from American Airlines its computer record of any reservations on the New York City flight in the name of, or connected with, Morales or Lebrón. The airline provided a single computer printout reflecting that Morales and Lebrón both had reserved seats on the flight and had checked two bags each. The printout also showed two other persons—Carlos Acosta and Noel Travieso—as being connected with the Morales/Lebrón reservation, which suggested that all four individuals might be traveling together. The computer record did not indicate that Acosta himself had checked any bags.

At about 12:30 p.m., three customs inspectors dressed in plain clothes were dispatched to the gate from which the New York City flight was to depart. The inspectors stationed themselves in the jetway leading from the gate to the airplane and checked the name on each passenger's ticket as he or she attempted to board.[1] When Acosta, Noel Travieso, and a third suspect unnamed in the record (but evidently known to local authorities) were identified by this method, the inspectors took their boarding passes and instructed them to step to one side of the jetway and wait there until the boarding process was concluded. Acosta complied and was thus detained on the jetway for approximately five minutes. He was not asked any questions during this time.

After all passengers had boarded the plane (neither Morales nor Lebrón having appeared at the gate), the customs inspectors informed Acosta, Travieso, and the third suspect that they were to be taken to a "customs enclosure area" pending investigation of some suspicious baggage. They were not asked to give their consent, and they said nothing in response. Then, without conducting a pat-down or asking any questions, and while they were still on the jetway, the inspectors handcuffed the three suspects to each other, side-by-side, using two sets of restraints. Although the inspectors were armed, they did not display their weapons. The suspects did not resist. The customs inspectors led the three handcuffed suspects, on foot, to the customs enclosure area. The trip, which the government concedes was not voluntary, took approximately six to eight minutes. Acosta and the others missed their flight.

Once the suspects were brought into the customs enclosure area, they were patted down for weapons and, none being found, their handcuffs were removed.[2] According to the parties' stipulation of facts, the three

---

1. As stated in the district court's opinion, the "jetway" refers to the tunnel-like passageway leading from the airport terminal to the airplane.

2. The parties stipulated for purposes of obtaining a ruling on the defendant's motion to suppress that Acosta's handcuffs were removed once he was brought to the customs enclosure area. However, one of the customs inspectors testified at the suppression hearing that, although he did not see what happened to Acosta, the suspect he happened to be watching was actually handcuffed to his chair. After Acosta's motion to suppress was denied and he entered his conditional plea of guilty, defense counsel stated for the record (at the end of the plea hearing) that Acosta had stipulated that his handcuffs were removed only "for the purposes of the suppression hearing." The intended effect of this qualifying statement by counsel is not entirely clear. For purposes of this appeal, however, the parties appear to abide by their original stipulation of facts. Accordingly, we assume that Acosta's handcuffs were in fact removed after he was patted down inside the customs enclosure area.

suspects were, at this point, "transferred to the custody of the DEA" and were placed in separate rooms that have been variously described in the briefs and at oral argument as "interview," "interrogation," or "detention" rooms.[3] After Acosta had been left in his interrogation room for approximately 15 minutes—during which time he was never interviewed or questioned—a customs inspector observed him trying to eat two pieces of paper. The inspector entered Acosta's room and extricated the papers from his mouth. They were baggage claim tickets. The numbers on the tickets matched the tags on the two previously-seized suitcases registered to Jesus Lebrón (which, upon later examination, turned out to contain approximately 15 kilograms of cocaine each). Acosta was advised of his *Miranda* rights and was formally placed under arrest.[4] Waiving his right to remain silent, he made several potentially self-incriminating statements.

Acosta was indicted on one count of possessing cocaine with intent to distribute. Following a plea conference, Acosta filed a motion to suppress, arguing that his airport detention constituted a *de facto* arrest without probable cause, and that the incriminating baggage claim tickets he had tried to eat and the statements he made to authorities thereafter constituted the fruits of that illegal arrest. After two hearings, and following the parties' submission of their stipulated statement of facts, the district court denied the defendant's motion. Acosta subsequently pled guilty pursuant to the terms of a conditional plea agreement, in which he reserved his right to appeal the district court's ruling on the motion to suppress. The court accepted his plea, and Acosta was accordingly sentenced to 70 months of imprisonment and five years of supervised release.

## II.

### A.

◼ As a preliminary matter, we think it important to clarify that, despite the involve-

ment of the Customs Department and its agents both in the initial detection of the drug-laden bags and the stop of the defendant, nothing in the record or the briefs indicates that the bags or any of the suspects were required to pass through U.S. Customs, or were involved in any international border-crossing. Thus, the special standards governing the constitutionality of border searches have no application here. *See, e.g., United States v. Montoya de Hernandez,* 473 U.S. 531, 538, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985) (explaining that the rules governing the constitutionality of searches and seizures are "qualitatively different at the international border than in the interior").

The question presented in this appeal is narrowly drawn. There is no dispute that the defendant was "seized" for Fourth Amendment purposes when he was prevented from boarding his scheduled flight. *See, e.g., United States v. Streifel,* 781 F.2d 953, 960 (1st Cir.1986) (explaining that a "seizure" occurs when a reasonable person in the suspect's position would have believed he was not free to leave). Furthermore, the government does *not* contend that the stop of Acosta on the jetway was supported by probable cause. It seeks, instead, to justify the detention as a reasonable investigatory stop falling within the limits of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The defendant, for his part, does *not* attempt to argue that the government lacked the requisite level of suspicion to warrant a *Terry*-type stop at the jetway. He asserts, rather, that both the mode and duration of his detention were unreasonable in the circumstances, exceeded the parameters of *Terry,* and constituted a *de facto* arrest unsupported by probable cause. The district court sided with the government, ruling that Acosta's detention was a lawful *Terry* stop.

### B.

◼ In assessing the district court's determination, we review its findings of fact for

---

**3.** There is no evidence in the record indicating whether the rooms were locked, but counsel for the government represented to the district court at the suppression hearing that the door to Acosta's interrogation room was left open. At oral argument on appeal, however, government counsel stated it was not clear from the record wheth-

er the door was open, closed, or locked, but that in any event, Acosta certainly would not have been permitted to leave the room had he attempted to do so.

**4.** The other two suspects were released.

clear error, but we review *de novo* its conclusions of law and its ultimate rulings on the constitutionality of the government's conduct. *See United States v. Young*, 105 F.3d 1, 5 (1st Cir.1997). We bear in mind, too, that where a defendant challenges the constitutionality of a warrantless seizure undertaken on the basis of suspicion falling short of probable cause, the government bears the burden of proving that the seizure was sufficiently limited in its nature and duration to satisfy the conditions of a *Terry*-type investigative stop. *See Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion); *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir.1995), *cert. denied*, 518 U.S. 1007, 116 S.Ct. 2528, 135 L.Ed.2d 1052 (1996); *United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir.1993).

### C.

Before the Supreme Court's decision in *Terry*, all "seizures" of persons were analyzed as "arrests," which could be constitutionally justified only when the government had probable cause to believe that the seized person had committed or was committing a crime. *See Dunaway v. New York*, 442 U.S. 200, 208–09, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *United States v. Quinn*, 815 F.2d 153, 156 (1st Cir.1987); Wayne R. LaFave, *Search and Seizure* § 5.1(a), at 9 (3d ed.1996). In *Terry*, the Court gave effect to the notion that some types of encounters between the police and citizens—such as brief detainments in the nature of a "stop and frisk"—could constitute "seizures" for Fourth Amendment purposes, yet be sufficiently limited in their intrusiveness to fall outside the traditional understanding of an "arrest." *See Dunaway*, 442 U.S. at 208–09, 99 S.Ct. 2248. The Court held that these limited types of seizures, by virtue of their low level of intrusiveness relative to the important law enforcement purposes they served, could be constitutionally justified on a level of suspicion falling short of probable cause. *See id.* at 209, 99 S.Ct. 2248; *Terry*, 392 U.S. at 27, 88 S.Ct. 1868; LaFave, *supra*, § 5.1(a), at 9.

■ Over time, the *Terry* doctrine has developed into an extremely elastic rule with a broad range of application. In its modern adaptation, the doctrine provides that "based merely on a reasonable and articulable suspicion, a police officer may make a brief stop or 'seizure' of an individual to investigate suspected past or present criminal activity." *United States v. McCarthy*, 77 F.3d 522, 529 (1st Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 771, 136 L.Ed.2d 717 (1997). Such a seizure will be upheld as constitutionally permissible so long as it was "justified at its inception, and, if so, . . . the action taken was reasonably related in scope to the circumstances which justified the interference." *Young*, 105 F.3d at 6.

■ This general test of reasonableness is obviously expansive in its compass. As a doctrinal matter, however, the test presupposes that the seizure under scrutiny was, on the whole, a less intrusive measure than an actual arrest. In other words, a warrantless seizure supported by less than probable cause *necessarily* falls below the applicable threshold of reasonableness if the seizure was the functional equivalent of an arrest. *See, e.g., Quinn*, 815 F.2d at 156 (stating that detentions "which though not technical, formal arrests are the 'equivalent of an arrest' . . . require probable cause"). This must be so because *Terry* was intended to carve out an exception to the probable cause requirement only for relatively brief, *non-arrest* detentions; plainly, a seizure that is, *de facto*, tantamount to an arrest cannot fit within that exception. *See id.; see also United States v. Zapata*, 18 F.3d 971, 975 (1st Cir.1994).

■ There is no "litmus-paper test," however, to determine whether any particular mode of detention amounted to a *de facto* arrest. *Royer*, 460 U.S. at 506, 103 S.Ct. 1319 (plurality opinion); *see also Zapata*, 18 F.3d at 975 (no "scientifically precise formula"); *Quinn*, 815 F.2d at 156 (no "mechanical checklist"). It is often said that an investigatory stop constitutes a *de facto* arrest "when 'a reasonable man in the suspect's position would have understood his situation,' in the circumstances then obtaining, to be tantamount to being under arrest." *Zapata*, 18 F.3d at 975 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 441, 104 S.Ct. 3138, 82 L.Ed.2d

317 (1984)); *see also Young,* 105 F.3d at 7; *Quinn,* 815 F.2d at 157; LaFave, *supra,* § 5.1(a), at 9. But in a typical borderline case, *e.g.,* one in which the detention at issue has one or two arrest-like features but otherwise is arguably consistent with a *Terry* stop, it will not be obvious just how the detention at issue ought reasonably to have been perceived; indeed, this will be the central point of contention. Thus, in such a case—that is, where the detention is distinguishable from, yet has some features normally associated with, an arrest—the analysis must revert to an examination of whether the particular arrest-like measures implemented can nevertheless be reconciled with the limited nature of a *Terry*-type stop. This assessment requires a fact-specific inquiry into whether the measures used were reasonable in light of the circumstances that prompted the stop or that developed during its course. *See Young,* 105 F.3d at 8 ("Above all else, our cases in this area evince the fact specific nature of the inquiry."); *Washington v. Lambert,* 98 F.3d 1181, 1185 (9th Cir.1996) (suggesting that the same police actions can constitute a *de facto* arrest in some circumstances but not in others).

### D.

■ It can hardly be doubted that the initial stop and subsequent detention of Acosta featured several characteristics ordinarily associated with an arrest: he was prevented from boarding his plane, placed in handcuffs, involuntarily transported (in restraints) to an official holding area some distance from the place of the original stop, confined to a small interrogation room and kept there under observation for more than a momentary period; yet he was never informed how long he would be detained nor told that he was *not* under arrest. *See United States v. Glenna,* 878 F.2d 967, 972 (7th Cir.1989) ("[H]andcuffs are restraints on movement normally associated with arrest. Clearly, the thought

of allowing police officers to handcuff persons where probable cause to arrest is lacking is a troubling one."); *McCarthy,* 77 F.3d at 532 (noting, in finding that detention was a permissible *Terry* stop, that the suspect "was never handcuffed" and was told he was not under arrest); *United States v. Berry,* 670 F.2d 583, 598 (5th Cir.1982) (en banc) (suggesting that bringing a suspect to a police office effects "a marked increase in the coercive nature" of a detention). Furthermore, Acosta's detention caused him to miss his flight to New York, and there is no suggestion that authorities ever communicated to Acosta any concern over disrupting his travel plans; certainly, they never gave him the choice of leaving. *Cf. United States v. West,* 731 F.2d 90, 91, 93–94 (1st Cir.1984) (no constitutional violation found where suspect was given choice of waiting at airport and missing his flight while officers called in a narcotics-detecting dog to sniff his suitcase, or departing on his flight but leaving his suitcase behind);[5] *United States v. Tavolacci,* 895 F.2d 1423, 1428 (D.C.Cir.1990) (detention more likely to qualify as a *Terry* stop if it "did not interfere with defendant's travel plans").

These circumstances create, at the very least, a substantial question as to whether a reasonable person in Acosta's position would have understood his situation as tantamount to being under arrest. But we need not rely solely on intuition to decide whether the mode of Acosta's airport detention indeed exceeded the limits of an investigatory *Terry* stop. Instead, we make our determination against the background of the Supreme Court's decision in *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). There, a plurality of the Court concluded that an airport detention quite similar to Acosta's—but in some ways *less* intrusive— exceeded the outer limits of a *Terry*-type stop and constituted a *de facto* arrest.[6] Be-

---

5. The suspect in *West* ultimately chose to leave without his luggage. While he was en route to his destination, a canine unit detected drugs in the suitcase, a warrant was obtained, and a search of the suitcase turned up a quantity of drugs. Federal authorities at the suspect's destination city were so notified, and the suspect was arrested there. *See* 731 F.2d at 91.

6. The plurality opinion in *Royer* was authored by Justice White and joined by three other justices. Justice Brennan concurred in the result but did not join Justice White's opinion, because in Justice Brennan's view, the initial stop of the defendant was unsupported by reasonable suspicion and hence was illegal from the outset; for this reason, Justice Brennan saw no need to address

cause of the case's special relevance here, we discuss it in some detail.

In *Royer*, two narcotics detectives at Miami International Airport observed an individual, Royer, who fit a so-called "drug courier profile." *Id.* at 493, 103 S.Ct. 1319. After Royer purchased a one-way ticket to New York and checked two bags, the detectives stopped him and asked whether he "had a 'moment' to speak with them"; Royer responded "yes." *Id.* at 494, 103 S.Ct. 1319. On request, Royer handed the officers his airline ticket and driver's license. When the officers pointed out to Royer that the name on his ticket did not match the name on his driver's license, he became noticeably nervous. *See id.* The detectives, after identifying themselves as law enforcement officers and telling Royer that they suspected he was transporting narcotics, asked him to accompany them to a closet-sized room located in a "stewardesses' lounge" just adjacent to the public concourse area, approximately 40 feet away from the point of their initial encounter. *Id.* Royer said nothing but followed the officers into the room, whereupon his bags were retrieved and brought there. *See id.* With Royer's permission (or at least his passive acquiescence), one of the officers opened both of the two suitcases; a quantity of marijuana was found in each. *See id.* At that point—about 15 minutes from the time of his initial stop—Royer was formally arrested. *See id.*

In holding that Royer's Fourth Amendment rights were violated, Justice White, writing for a plurality of the Court, stated that "[i]n the name of investigating a person who is no more than suspected of criminal activity, the police may not ... seek to verify their suspicions by means that approach the conditions of an arrest." 460 U.S. at 499, 103 S.Ct. 1319. Reviewing the salient features of the investigatory seizure at issue, the plurality opinion summarized the facts as follows:

> [The officers] requested [Royer] to accompany them to the police room. Royer went

with them. He found himself in a small room—a large closet—equipped with a desk and two chairs.... What had begun as a consensual inquiry in a public place had escalated into an investigatory procedure in a police interrogation room, where the police, unsatisfied with previous explanations, sought to confirm their suspicions. The officers had Royer's ticket, they had his identification, and they had seized his luggage. Royer was never informed that he was free to board his plane if he so chose, and he reasonably believed that he was being detained.

*Id.* at 502–03, 103 S.Ct. 1319. Based on these facts, the plurality concluded that, "[a]s a practical matter, Royer was under arrest," *id.* at 503, 103 S.Ct. 1319, and that his detention therefore exceeded the limits of a *Terry* stop, *id.* at 507, 103 S.Ct. 1319.

There is little to distinguish Acosta's case from *Royer*. The governmental objective here, as in *Royer*, was to investigate a possible drug-trafficking offense—more specifically, to confirm or dispel a suspicion that Acosta had a connection with certain luggage believed to contain narcotics (or with the persons to whom the bags were registered). If anything, though, the mode of Acosta's detention was *more* intrusive than Royer's: Acosta's stop did not "beg[i]n as a consensual encounter," 460 U.S. at 503, 103 S.Ct. 1319; he was handcuffed, involuntarily taken to a secured area (the "customs enclosure area") much farther than 40 feet from the place of his initial stop; and he was confined to an *official* interrogation room (rather than a "stewardesses' lounge"), from which the government concedes he was not free to leave. Moreover, the total time of Acosta's detention (up to the time of the formal arrest) was nearly twice as long as Royer's.

The government makes no suggestion that *Royer* is no longer good law, nor does it deny the similarities between that case and this one. Instead, the government asks us to

---

whether the stop was conducted in such a manner as to constitute a *de facto* arrest. *See* 460 U.S. at 509, 103 S.Ct. 1319 (Brennan, J., concurring). However, Justice Brennan did state explicitly in his concurring opinion that he agreed with the plurality's conclusion that, assuming that the initial stop was legal, the detention of the

suspect "clearly exceeded the permissible bounds of a *Terry* 'investigative stop.'" *Id.* Thus, although technically speaking, Justice White's opinion was supported by four members of the Court, five members supported his main conclusion—the conclusion relevant to this case—that the stop at issue constituted a *de facto* arrest.

focus upon the *Royer* plurality's statement that "[t]here are undoubtedly reasons of safety and security that would justify moving a suspect from one location to another during an investigatory detention, such as from an airport concourse to a more private area." 460 U.S. at 504, 103 S.Ct. 1319. Parroting this language, the government asserts in its brief, with little elaboration, that "security reasons prompted the officers not to interview [Acosta] at the jetway and to transfer the site of the encounter . . . to the interrogation room."

■ The difficulty, however, is that the government has utterly failed to identify *specific facts* supporting its invocation of "security reasons" as justification for the movement of Acosta to the interrogation room.[7] It may well be true, of course, that it was indeed *safer* for authorities to question Acosta in an interrogation room than, for example, on the jetway. Common sense suggests that transporting a suspect to an interrogation room (or for that matter, locking him in a holding cell) will *always* incrementally enhance the safety and security of law enforcement officers and the public. In this sense, there will *always* exist "security reasons" to move the subject of a *Terry*-type stop to a confined area pending investigation. But if this kind of incremental increase in security were sufficient to warrant the involuntary movement of a suspect to an official holding area, then such a measure would be justified in *every Terry*-type investigatory stop. That result surely is not within the contemplation of *Royer.* *See* LaFave, *supra,* § 9.2(g), at 75–76.

■ Whatever might qualify as "reasons of safety and security" sufficient to "justify moving a suspect from one location to another during an investigatory detention" (such as from the place of the initial stop to an interrogation room), *Royer,* 460 U.S. at 504, 103 S.Ct. 1319 (plurality), the requisite justification cannot rest upon bald assertions, such as those offered by the government here, that law enforcement officers were in fact prompted to act on such reasons. The government must point to *some* specific fact or circumstance that could have permitted law enforcement officers reasonably to believe that relocating the suspect to a detention room was necessary to effectuate a safe investigation. *See Royer,* 460 U.S. at 505–06, 103 S.Ct. 1319 (plurality). It has failed to do so.

Our own independent examination of the record reveals very little that would aid the government's position. In fact, a reading of the suppression-hearing testimony of the customs inspector who initially stopped Acosta only underscores the *absence* of specific circumstances that might have supported a belief that the suspects' relocation to the detention area was necessary for reasons of safety or security. For example, when the customs inspector was asked by the prosecutor to explain the instructions he had received before attempting to intercept the suspects at the gate area, he testified he was told by his supervisor "[t]o identify [the suspects] if they boarded and—and to bring them back to the [customs] enclosure," whereupon, according to "standard operating procedure," the suspects were to be "turned . . . over to [the] DEA."[8] Far from pointing to actual circum-

---

7. Our dissenting colleague emphasizes that Acosta's initial stop occurred during the airport's "rush hour," but there is no evidence that the *jetway* on which Acosta was stopped was itself even open to public traffic after the boarding of the departing flight had concluded. As far as the record shows, it was not the jetway—the place of the initial stop—that was affected by the "rush hour" at all; the crowded area of the airport was, instead, the public concourse through which the suspects were taken en route to the customs enclosure area. Thus, the fact that the stop occurred during "rush hour" does not provide a persuasive justification for moving Acosta from the place of the initial stop to the detention area.

8. Consistent with this testimony, the parties' stipulated statement of facts recites that once the suspects had been brought to the detention area, they were in fact "transferred to the custody of the DEA." But we should note that there is no independent evidence in the record to corroborate the customs officer's testimony about the "standard operating procedures" of the customs department, and the district court made no findings relating thereto. More importantly, the government has *not* argued—and there is nothing in the record that would support the proposition— that the actions of the customs officers were constitutionally reasonable by virtue of the fact that the "standard" procedures they were osten-

stances that might have justified a belief that an investigatory stop could not have been conducted safely without removing the suspects from the area of the jetway, this testimony suggests that the decision to move Acosta and the other suspects to the interrogation room was essentially predetermined, undertaken simply as a matter of routine for the purpose of facilitating a transfer of "custody" from the customs agents to the DEA.[9]

In all events, it is evident that here, as in *Royer*, "[t]he record does not reflect any facts which would support a finding that the legitimate law enforcement purposes which justified the detention in the first instance were furthered by removing" the defendant to an interrogation room in the so-called customs enclosure area. 460 U.S. at 505, 103 S.Ct. 1319.

### E.

■ The fact that Acosta was placed in handcuffs before being taken to the customs enclosure area further undercuts the government's position that Acosta's seizure fell within the scope of a *Terry* stop. We fully agree with the district court, and with the government, that the use of handcuffs in the course of an investigatory stop does not automatically convert the encounter into a *de facto* arrest. *See Perdue*, 8 F.3d at 1463 (collecting cases); *Quinn*, 815 F.2d at 157 n. 2. Police officers engaged in an otherwise lawful stop must be permitted to take measures—including the use of handcuffs—they believe reasonably necessary to protect

themselves from harm, or to safeguard the security of others. *See, e.g., Michigan v. Long*, 463 U.S. 1032, 1047, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983); *Washington*, 98 F.3d at 1186; *United States v. Stanley*, 915 F.2d 54, 57 (1st Cir.1990).

But to say that the use of physical restraints is not *necessarily* inconsistent with a *Terry*-type stop does not imply that law enforcement authorities, acting on less than probable cause, may handcuff suspects as a matter of routine. *See Washington*, 98 F.3d at 1187 ("Under ordinary circumstances, when the police have only reasonable suspicion to make an investigatory stop, drawing weapons and using handcuffs and other restraints will violate the Fourth Amendment."); *United States v. Smith*, 3 F.3d 1088, 1094 (7th Cir.1993) (seizure involving use of handcuffs may be upheld as *Terry* stop "in the 'rare' case wherein common sense and ordinary human experience convince us that an officer believed reasonably that an investigative stop could be effectuated safely only through the use of handcuffs" (citation omitted)); *see also* LaFave, *supra*, § 9.2(d), at 39, 41–42.

■ There is no question that the use of handcuffs, being one of the most recognizable indicia of a traditional arrest, "substantially aggravates the intrusiveness" of a putative *Terry* stop. *Glenna*, 878 F.2d at 972; *see also United States v. McQuagge*, 787 F.Supp. 637, 645 (E.D.Tex.1991), *aff'd, United States v. Mallory*, 8 F.3d 23 (5th Cir.1993) (unpublished opinion). Thus, when the government seeks to prove that an investigatory deten-

sibly following were themselves reasonable or otherwise justified as a whole.

9. In respect to these facts, Acosta's detention is arguably similar to the one characterized as a *de facto* arrest in *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). There, the police, acting without probable cause, had "pick[ed] up" the defendant at a neighbor's house, "br[ought] him in" to police headquarters, and then placed him in an interrogation room for questioning. *Id.* at 207, 99 S.Ct. 2248. The Court found that this investigatory detention "was in important respects indistinguishable from a traditional arrest" and held that it could not be justified as a *Terry* stop. It noted that "any 'exception that could cover a seizure as intrusive as that in this case would threaten to swallow the general rule that Fourth Amendment

seizures are 'reasonable' only if based on probable cause." *Id.* at 213, 99 S.Ct. 2248. The Court cautioned that "detention for custodial interrogation—regardless of its label—intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest." *Id.* at 219, 99 S.Ct. 2248. To the extent that the record in this case supports an inference that Acosta was brought to the customs detention area and placed in an interrogation room in order to effect a transfer of "custody" to and permit questioning by the DEA, the rule of *Dunaway* arguably comes into play. *Cf. United States v. Codd*, 956 F.2d 1109, 1111 (11th Cir.1992) (holding that two and one-half hour detention at airport police office was analogous to the *de facto* arrest in *Dunaway* ).

tion involving the use of handcuffs did not exceed the limits of a *Terry* stop, it must be able to point to *some* specific fact or circumstance that could have supported a reasonable belief that the use of such restraints was necessary to carry out the legitimate purposes of the stop without exposing law enforcement officers, the public, or the suspect himself to an undue risk of harm. *See Washington*, 98 F.3d at 1189 (describing examples of such circumstances); *Glenna*, 878 F.2d at 972–73; *McQuagge*, 787 F.Supp. at 645–46; LaFave, *supra*, § 9.2(d), at 40–42 (illustrating "special circumstances" in which use of handcuffs might not exceed the limits of a *Terry* stop).

In this case, the government identifies no such specific circumstances. There has been no suggestion that any one of the suspects was being uncooperative, belligerent, or showed any perceptible inclination to put up resistance or become violent. Nor is there evidence that any of the customs officers harbored an *actual* suspicion that Acosta was armed [10] or otherwise presented an appreciable danger.[11] The government nevertheless argues that the handcuffing of Acosta was reasonable because "the officers['] intervention was premised on reasonable suspicion of drug interdiction," and Acosta, simply by virtue of being a suspected drug trafficker, "could [have] be[en] armed," and this possibility created a risk of harm to the "many innocent bystanders" present in the general area (though presumably not in the jetway itself) where Acosta was initially stopped.[12]

■■ These highly generalized statements are inadequate to establish that the handcuffing of Acosta was a reasonably measured response to actual safety concerns arising from the stop.[13] Like the government's explanation for transporting Acosta to the interrogation room, its factually unanchored justification for placing Acosta in handcuffs is generalizable to virtually *every* investigatory stop involving a drug suspect. To accept that purported justification here would therefore be to endorse the use of handcuffs in *every* investigatory stop initiated upon an articulable suspicion of drug trafficking. This we are not prepared to do. *See United States v. Melendez–Garcia*, 28 F.3d 1046, 1052–53 (10th Cir.1994) (acknowledging reality that "[d]rugs and guns and violence often go together" but holding that "the naked fact that drugs are suspected will not support a *per se* justification for use of . . . handcuffs in a *Terry* stop").

We also find inadequate the government's suggestion that the use of handcuffs may have been warranted by the need to ensure the safety of law enforcement officials and the public as the suspects were being transported to the customs detention area. First, as we have already noted, the government

---

10. As to whether the officers *could* reasonably have suspected that Acosta was actually armed, it is relevant to observe that Acosta had successfully passed through the airport's metal detectors by the time he was stopped. *Cf. United States v. Kelly*, 913 F.2d 261, 264 (6th Cir.1990) (noting that airport security devices reduce likelihood that airplane passengers will be armed).

11. Both the government and the district court have noted (as has the dissent) that one of the suspects other than Acosta happened to be a very large man, weighing over 300 pounds. But even if this fact might have justified restraining that particular individual (an issue we do not consider), we fail to see how it could plausibly be cited as a legitimate reason for placing handcuffs on *Acosta*.

12. The dissent's analysis relies heavily on the assumption that the customs inspectors who stopped Acosta knew "to a practical certainty" that "a *substantial* quantity of drugs was being transported by one or more passengers about to

board the departing American Airlines flight." The government has *not* asserted in this appeal, however, nor has it pointed to any evidence in the record to suggest, that the customs inspectors had *any* information or knowledge about the *quantity* of drugs contained in the suspect luggage at the time of Acosta's stop and detention. The government's brief states only that a canine unit detected the presence of *some* quantity of drugs in four suitcases, and that, at some unspecified time, the *two* suitcases that matched the claim tickets in Acosta's possession were found to contain 15 kilograms of cocaine each.

13. We note that the officers did not frisk Acosta until *after* he had been brought to the customs enclosure area, rather than immediately after he was handcuffed and before he was led out of the jetway into the airport concourse. *Cf.* LaFave, *supra*, § 9.2(d), at 42 (suggesting that if handcuffs are used in a *Terry* stop based on a suspicion that the suspect is armed, the restraints normally must be removed following a pat-down revealing the absence of weapons).

fails to specify any factual basis for its supposition that Acosta or the other two suspects might have presented an actual danger to the public or to the customs officers (who were, after all, armed).[14] But more importantly, as discussed above, the government has failed to demonstrate that Acosta's transportation to (and subsequent detention in) the customs enclosure area was itself within the limits of a *Terry* stop. Plainly, therefore, the need to facilitate that very detention cannot provide a valid justification for the use of handcuffs; such an argument would be naked bootstrapping, at best. The government's *Terry* argument requires the identification of specific circumstances that could have been thought to necessitate the use of handcuffs to carry out safely the *legitimate* purposes of the stop: here, investigating Acosta's connection with the narcotics-laden suitcases. *Cf. Royer,* 460 U.S. at 505, 103 S.Ct. 1319. No such circumstances have been identified.

### F.

 Although we have been discussing, to this point, only whether the *mode* of Acosta's detention was consistent with a *Terry* type investigatory stop, we add a few words about the detention's overall duration. There is, of course, "no rigid time limitation on *Terry* stops," *United States v. Sharpe,* 470 U.S. 675, 685, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985), and we have previously upheld the constitutionality of investigatory stops based on reasonable suspicion lasting for as long as 75 minutes, *see McCarthy,* 77 F.3d at 531.

Still, an investigatory detention of close to 30 minutes—particularly one that interferes with an individual's "liberty interest in proceeding with his itinerary," *Place,* 462 U.S. at 708, 103 S.Ct. 2637—is hardly a trivially intrusive affair. The question is whether the length of Acosta's detention was reasonable, considering " 'the law enforcement purposes to be served by the stop ... and whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.' " *McCarthy,* 77 F.3d at 530 (quoting *Sharpe,* 470 U.S. at 686, 105 S.Ct. 1568).

The government's stated purpose for stopping Acosta was to investigate whether he had any connection with or knowledge of the narcotics-laden suitcases that had been checked on the New York-bound flight that Acosta was about to board. Yet, conspicuously absent from the government's presentation is *any* description of a single investigatory action that was being pursued by law enforcement authorities, while Acosta was being detained, to "confirm or dispel" their suspicion that Acosta was involved with the suitcases.[15] In fact, the government fails to provide us with any insight at all into what the customs office, the DEA, or any other law enforcement body was doing during the time that Acosta was being detained on the jetway, transported to the customs area, and left to wait in an interrogation room. We have thus been provided with no basis in the record to conclude that the responsible au-

14. The customs inspector who testified at the suppression hearing stated initially that the suspects were handcuffed "because we were detaining them for investigation purposes and to safeguard them and us and the ... public." But upon further prompting by the prosecutor, the inspector explained that handcuffing was considered "S.O.P."—standard operating procedure—in the customs office. On cross-examination, the officer admitted that the "number one" reason for handcuffing the suspects before bringing them back to the detention area was to comply with standard operating procedure for a "customs detention," and he added that "if [the suspects] did get away we'd have actually [sic] dereliction of duty." The testifying officer's stated reliance on "standard operating procedure" tends to suggest that the decision to use handcuffs did not depend upon the presence of specific circumstances that (objectively) might have

necessitated their use. The dissent asserts that "the defense has never challenged" the purported "SOP," but the defendant surely is not required to do so in order to assert that his stop and detention amounted to a *de facto* arrest. It is the government that bears the burden of demonstrating that Acosta's stop fell within the scope of *Terry.* The government has *not* attempted to carry its burden in this case by arguing that the customs officers were following standard *procedures,* let alone that those procedures themselves could constitutionally be justified.

15. As stated in the parties' stipulation of facts, the authorities did not even ask Acosta any questions until after he attempted to swallow the incriminating baggage claim tickets that evidently had been in his possession (which, curiously, he had not previously been asked to produce).

thorities were pursuing *any* active investigation, let alone were "diligent" in doing so, to "confirm or dispel" their suspicions concerning Acosta. There has been no suggestion, furthermore, that Acosta was uncooperative or otherwise was himself partly to blame for the extended length of his detention. Thus, unlike in *McCarthy*, where the record supported a finding that the suspect's detention became prolonged *in spite of* the diligent efforts of police officers, *see* 77 F.3d at 531–32, the record before us is devoid of any factual basis on which we could make a similar finding.

## G.

■ We emphasize, as we have already said, that there are no bright-line rules to determine whether an investigatory stop initiated on the basis of reasonable suspicion falls within the ambit of *Terry*. Thus, even though several aspects of Acosta's stop and detention (particularly when viewed in combination) appear to mirror characteristics of a traditional arrest, these features do not automatically convert the episode into a *de facto* arrest. The presence of these arrest-like features does, however, require the government to identify *specific* facts or circumstances which could have led the acting law enforcement officers reasonably to believe that the use of such measures was required to effectuate safely the contemplated investigation. The government has not done so. Similarly, while there are surely a variety of circumstances that could permit a finding of constitutional reasonableness with respect to an investigatory stop of a duration comparable to or exceeding that of Acosta, the government is required at least to identify specifically what those circumstances might be. Again, it has not done so. The government has thus failed to meet its burden of demonstrating that Acosta's seizure was sufficiently limited in its intrusiveness to have been constitutionally permissible in the absence of *probable cause*. In so finding, we do not decide whether the government's failure to provide adequate justification for any *single* aspect of Acosta's seizure, considered in iso-

lation, would have yielded a similar conclusion. But given the absence of basis in the record to support a finding of constitutional reasonableness as to any *one* of the challenged aspects of the defendant's warrantless seizure, we have little choice but to hold that the stop, handcuffing, and ensuing detention at issue amounted to an unlawful *de facto* arrest.

## III.

■ Our holding that the defendant's stop and detention exceeded the limits of a lawful *Terry* stop does not completely resolve this case. While the conclusions we have reached require us to reverse the district court's ruling that Acosta's constitutional rights were not violated, those conclusions do not determine the scope of the suppression order (if any) to be entered.[16] Because the court below denied the defendant's motion to suppress, it had no occasion to make any findings as to the particular items of evidence that might constitute the "fruits" of any violation of Acosta's rights. But the question whether the evidence the defendant seeks to suppress constitutes the fruit of the poisonous tree or has been sufficiently " 'purged of the primary taint' " caused by the illegal seizure "depends primarily upon weighing the facts in the particular case, ... and is thus a matter especially suitable for resolution by the district court" in the first instance. *United States v. Finucan*, 708 F.2d 838, 843 (1st Cir.1983) (quoting *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (internal citation omitted)). We must, therefore, remand this matter to the district court for specific findings identifying which items of evidence, if any, can properly be deemed the fruits of Acosta's illegal seizure.

We think it fair to note, however, that based on the record currently before us, we can see no reason why the baggage claim tickets Acosta tried to swallow ought *not* be found to constitute the fruits of his illegal detention. *Cf. United States v. King*, 990 F.2d 1552, 1563–64 (10th Cir.1993) (finding that drugs defendant attempted to discard

---

16. The illegality of Acosta's seizure does not bar his prosecution or conviction. *United States v.*

*Crews*, 445 U.S. 463, 474, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980).

during illegal arrest were illegal fruits); La-Fave, *supra*, § 2.6(b), at 584–85 ("[W]here a person has disposed of property in response to a police effort to make an illegal seizure … courts have not hesitated to hold that property inadmissible." (footnotes omitted)). On the other hand, the status of the statements Acosta made to authorities after receiving his *Miranda* warnings appears to us to present a closer question, one as to which we express no view at this time. *See Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (setting forth the relevant analysis); *United States v. Ramos*, 42 F.3d 1160, 1164 (8th Cir.1994) (explaining the holding of *Brown*), *cert. denied*, 514 U.S. 1134, 115 S.Ct. 2015, 131 L.Ed.2d 1013 (1995); *United States v. Butts*, 704 F.2d 701, 704–05 (3d Cir.1983) (same).

## IV.

For the reasons stated, the district court's denial of the defendant's motion to suppress is *reversed*, the judgment of conviction is *vacated*, and this case is *remanded* for further proceedings consistent with this opinion. The defendant shall be permitted to withdraw his plea of guilty, pursuant to the terms of his conditional plea agreement. *Cf. United States v. Infante-Ruiz*, 13 F.3d 498, 505 (1st Cir.1994).

*So Ordered.*

**CYR, Senior Circuit Judge (dissenting).**

Objective reasonableness is the touchstone for the present inquiry into whether the challenged *Terry* stop—reasonable at its inception—remained "reasonably related in scope to the circumstances which justified the interference in the first place." *See Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "The court must consider the circumstances as a whole, and must balance the nature of the intrusion with the governmental interests that are served." *United States v. Cruz*, 156 F.3d 22 (1st Cir. 1998) (quoting *United States v. Hensley*, 469 U.S. 221, 228, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985)). It is a fact-intensive inquiry which contemplates a case-by-case balancing of the intrusiveness of the challenged police conduct, on the one hand, against the safety of the general public and the law enforcement officers on the other. *See Michigan v. Long*, 463 U.S. 1032, 1046, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) (*citing Terry*, 392 U.S. at 21, 88 S.Ct. 1868). In my view the majority opinion overlooks legitimate law enforcement and safety concerns which amply demonstrate the objective reasonableness of the challenged stop. *See Terry*, 392 U.S. at 23, 88 S.Ct. 1868 ("Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.").

The threshold focus is narrow: did the law enforcement officers act reasonably in relocating Acosta and his traveling companions from the jetway to the secure custom enclosure area ("CEA")? If so, the further measures taken by the officers to protect themselves and the traveling public during the relocation—*e.g.*, handcuffing and preventing Acosta from boarding the scheduled flight—were entirely warranted.[17]

Like Acosta, the majority relies heavily upon *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). Although *Royer* remains viable precedent, it is not apposite. Most notably, *Royer* explicitly left open the possibility that some *Terry*-type "transportation" might be warranted in an airport setting. *See id.* at 504–05, 103 S.Ct. 1319 ("[T]here are *undoubtedly* reasons of safety and security that would justify moving

---

17. The majority warns that handcuffing—if deemed reasonable in these circumstances—would be rendered reasonable in *all* airport *Terry* stops since handcuffing invariably enhances officer safety. I cannot agree. Officer Herdmann testified, unequivocally, to the *particular* considerations which warranted handcuffing in these circumstances: (1) the relatively high level of reasonable suspicion that Acosta was involved in a large-scale drug trafficking offense; (2) the evidence indicating a concerted, high-volume, multi-person drug operation, as distinguished from the isolated conduct of a single person; (3) the *Terry* stop took place in an airport during "rush hour," when the concourse would be unusually crowded; and (4) one of Acosta's traveling companions weighed approximately 300 pounds, thereby posing an abnormal escape threat. Thus, these particularized record facts plainly do not ordain a *per se* "handcuffing" rule in airport *Terry*-stop cases.

a suspect from one location to another during an investigatory detention, such as from an airport concourse to a more private area ... [but][t]here is no indication in this case that such reasons prompted the officers to transfer the site of the encounter from the concourse to the interrogation room.") (emphasis added); *V–1 Oil Co. v. Means,* 94 F.3d 1420, 1427 (10th Cir.1996) (same); *United States v. Glover,* 957 F.2d 1004, 1012 (2d Cir.1992) ("We do not read *Royer* as establishing a *per se* rule that moving from an airport, bus, or train terminal to a police office during a *Terry*-type encounter, for purposes of further investigation, automatically converts an otherwise permissible stop into an impermissible arrest upon arrival at the office.") *United States v. Gonzalez,* 763 F.2d 1127, 1137 (10th Cir.1985) ("Changing the place of an investigatory detention is not *per se* a Fourth Amendment violation.") (Holloway, C.J., dissenting); *accord Eberle v. City of Anaheim,* 901 F.2d 814, 819 (9th Cir.1990) (citing *Royer* in upholding relocation from concourse of football stadium).

Although, as the majority opinion points out, the Acosta stop was more intrusive than that in *Royer,* intrusiveness is but one aspect of the balancing calculus. By their very nature *Terry* stops contemplate *progressively* intrusive law enforcement measures commensurate with the heightening levels of reasonable suspicion generated by the ongoing investigation. For example, a law enforcement officer may initiate a stop merely by asking a question to which the suspect may volunteer a response which arouses further suspicion, thereby affording grounds for increasing the intrusiveness of the stop. Should the officer acquire information which generates a reasonable suspicion that the detainee may be armed, for example, a patdown frisk would be warranted. Similarly, should the officer acquire information which gives rise to a reasonable suspicion that the detainee has committed a crime, more probing questions may be in order.

The only basis for suspicion possessed by the law enforcement agents when Royer was stopped was that he fit their "drug courier profile." No illegal drugs had been detected. By contrast, even before the custom inspec-

tors stopped Acosta, a canine sniff had *positively confirmed* the presence of illegal drugs in luggage scheduled to depart on the American Airlines flight which *Acosta* and his traveling companions were about to board. Moreover, *before* the custom inspectors ever left for the jetway, an American Airlines computer check had disclosed that Acosta and Travieso were the *only* persons scheduled to depart on the flight being boarded who might be traveling with "Morales" and "Lebron," the names used by the persons who had checked the drug-laden luggage. At the jetway the custom inspectors temporarily detained Acosta and Travieso pending confirmation that "Morales" and "Lebron" had not attempted to board the plane. At that point the inspectors reasonably concluded that the use of the names "Morales" and "Lebron" had been a ruse, and that it was likely that Acosta and/or one or both of his traveling companions were responsible for checking the luggage. Although the government conceded that probable cause was lacking at this point, given the confirmed canine sniff and the subsequent observations by the custom inspectors the level of reasonable suspicion nevertheless exceeded the official "hunch" predicated exclusively on the drug courier profile in *Royer.* And that substantially greater level of reasonable suspicion demonstrated a legitimate need for further investigative measures aimed at pinpointing the true identities of "Morales" and "Lebron."

Inspector Herdmann testified that removing Acosta to the CEA accorded with standard operating procedure ("SOP"), which the majority opinion mischaracterizes as a rote practice *dissociated* from any articulable law enforcement rationale. Quite the contrary, once the custom inspectors learned they had stopped a likely drug trafficker the reasonableness of the rationale for the SOP in these circumstances not only became evident but the objective reasonableness of the heightened law-enforcement intrusion which was to follow likewise became immediately apparent.

As the district court correctly observed, the custom inspectors rightly understood to a practical certainty, given the positive canine

sniff on *four* suitcases, that a *substantial* quantity of drugs was being transported by one or more passengers about to board the departing American Airlines flight.[18] The more egregious the drug trafficking, the greater the stakes and risks; and the more likely that the suspected perpetrators might attempt to avoid, resist and/or escape detention by resorting to force. Thus, the longer the suspected high-stakes drug traffickers remained in an unsecured area during the airport "rush hour," the more palpable the threat posed to the traveling public as well as the law enforcement officers themselves. *See United States v. Mendenhall,* 446 U.S. 544, 561–62, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) ("The public has a compelling interest in detecting those who would traffic in deadly drugs for personal profit.... Much of the drug traffic is highly organized and conducted by sophisticated criminal syndicates ... [so that] the obstacles to detection of illegal conduct may be *unmatched* in any other area of law enforcement.") (Powell, J., concurring) (emphasis added). Furthermore, since one of the detainees weighed approximately 300 pounds, the physical threat he and his two companions posed to the traveling public and the law enforcement officers strongly supported the reasonableness of the decision to relocate the three suspects to a secure, private area of the airport pending further investigation.

Second, the evidence that two persons (*i.e.,* "Morales" and "Lebron") had checked four suitcases containing illegal drugs afforded a rational basis for the district court finding that multiple persons were involved in the drug smuggling, some of whom may have remained at large and in a position to assist the three detainees. *See United States v.*

*Gilliard,* 847 F.2d 21, 25 (1st Cir.1988) (noting that in the *Terry* context it is "common knowledge that drug traffickers often carry deadly weapons"); *United States v. Trullo,* 809 F.2d 108, 113 (1st Cir.1987) (" '[W]e have recognized that to substantial dealers in narcotics, firearms are as much "tools of the trade" as are most commonly recognized articles of drug paraphernalia.' ") (citation omitted). Thus, in my view the district court supportably found that the custom inspectors were not required to complete their *Terry-*stop investigation in the unsecured jetway, exposed to the various articulable safety risks—to themselves and the traveling public—which could readily be avoided simply by relocating the suspects to a secure area nearby.[19] The majority opinion simply ignores the serious safety risks and the reasonableness of the more prudent alternative utilized by the law enforcement officers at the scene.

Finally, I find no case law which precludes law enforcement officers from resorting to an appropriate prophylactic SOP in circumstances which pose particularly serious safety risks either to the traveling public or the law enforcement officers themselves. Instead, there is considerable authority to the contrary. *See, e.g., Pennsylvania v. Mimms,* 434 U.S. 106, 109–10, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (endorsing government position that although "[i]t was apparently [police] practice to order all drivers out of their vehicles as a matter of course whenever they had been stopped for a traffic violation, ... this practice was adopted as a *precautionary measure* to afford a degree of protection to the officer and that it may be justified on that ground."); *see also Maryland v. Wilson,* 519 U.S. 408, 117 S.Ct. 882, 884, 137 L.Ed.2d 41 (1997) (extending *Mimms* to an SOP allowing police to order

18. The majority argues that there is no record support for the district court finding that the several suitcases contained a substantial amount of illegal drugs. I cannot agree. Although the record does not reflect the exact quantity of drugs involved, it was entirely reasonable for the district court to infer that it was most unlikely that the culprits would have elected to increase the risk of detection by dividing an insubstantial amount of illegal drugs among several suitcases.

19. The majority suggests that only the "public concourse" would have been crowded during the airport "rush hour," and that the government did not prove that the jetway was open to the

public. Be that as it may, the gate area immediately adjacent to a jetway normally is accessible to members of the public who submit to metal detector screening. Thus, it was by no means unrealistic to anticipate the risk that any of Acosta's confederates who remained at large may have been able to gain access to the jetway itself, prepared to use force. Furthermore, a jetway—the narrow passageway between the gate area and the aircraft being boarded—hardly offered the custom agents a reasonably "secure" area in which to conduct an ongoing criminal investigation.

all *occupants* from a stopped car); *United States v. Kimball*, 25 F.3d 1, 8 (1st Cir.1994) (sustaining, on safety grounds, a "[police] department policy not to engage in detailed interviews on the side of the road").

Nor does resort to such an SOP insulate law enforcement conduct from appropriate judicial review. Rather, the reviewing court must examine the reasonableness of the SOP in light of the circumstances in which it was utilized. Tellingly, however, the defense has never challenged either the efficacy of the SOP or the implicit foundation for its employment; that is, that no *public* area of the airport afforded a safe environment for detaining and interrogating the potentially dangerous suspects in these circumstances.[20] In these circumstances, given the high level of reasonable suspicion supporting the initial *Terry* stop, the safety threat posed to the traveling public and the law enforcement officers themselves, and the escape risk presented by any criminal associates remaining at large, it is unrealistic to second-guess the reasonable actions taken by the law enforcement officers at the scene. Accordingly, I respectfully dissent.

20. Rather than shift the burden of proof to the defendant, as the majority charges, I simply suggest that reasonable inferences fairly may be drawn from the SOP proffered in evidence by the government. Absent countervailing evidence, surely one reasonably may infer that security considerations militated against conducting jetway interviews of multiple felony suspects in these circumstances.