UNITED STATES of America,
Plaintiff,

v.

Omar ALVARADO–RODRIGUEZ, Rosa
I. Soto Encarnacion, Carlos Cabrera–
Polo, Defendants.

No. CR 98–259(SEC).

United States District Court,
D. Puerto Rico.

July 12, 1999.

Miguel A. Pereira, U.S. Attorney's Office District of P.R., Criminal Division, Hato Rey, PR, for plaintiff.

Rachel Brill, Hato Rey, PR, Jorge Diaz–Reveron, Hato Rey, PR, Joseph C. Laws, Federal Public Defender, San Juan, PR, Julio Morales–Sanchez, Van Rhyn, Lora–Longoria, Hato Rey, PR, Edgar R. Vega–Pabon, Hato Rey, PR, for defendants.

## OPINION AND ORDER

CASELLAS, District Judge.

Pending before the Court are several motions to suppress evidence filed by defendants Rosa Soto–Encarnación (Docket # 30), Omar Alvarado–Rodriguez (Docket # 31) and Carlos Cabrera–Polo. (Docket # 34) The Court held a hearing on the motions to suppress on February 23, 1999. Upon careful consideration of the wit-

nesses' testimony, the parties' arguments and the applicable law, defendants' respective motions to suppress are **DENIED.**

On November 20, 1998 at approximately 8 a.m., Orlando Báez, a U.S. Customs Service Agent, informed Oscar Negrón, a Special Agent of the Drug Enforcement Administration ("DEA"), about an anonymous tip which identified two heroin couriers traveling from Miami to the Luis Muñoz Marín International Airport in Puerto Rico. This anonymous tip identified the couriers as Omar Alvarado and Ivette Soto. According to the tip, the couriers would be traveling with a small child and would arrive that same day, November 20, at 9:20 a.m. on American Airline flight # 709.

Prior to 9:20 a.m. Agent Negrón proceeded to verify the identities of the two alleged couriers with the flight information officers of American Airlines. He verified that two passengers had purchased two tickets from Miami to San Juan, paid in cash, the same of their flight, November 20, 1998. The passenger-name record included Omar Alvarado and Ivette Soto. Just minutes before the plane from flight 709 opened its door upon arrival, Agent Negrón obtained a physical profile of Alvarado and Soto from the flight attendant. At approximately 9:20 a.m. Negrón observed two passengers, previously identified as Omar Alvarado and Ivette Soto, deplane flight # 709 with an infant. Negrón and Task Force Agent Arturo Román ("Román") began a surveillance upon the couple and followed them to the main terminal area near Café Caribe. At that point Negrón and Román approached Alvarado–Rodriguez ("Alvarado") and Soto–Encarnación ("Soto"), identified themselves as federal agents and began a conversation with them. Negrón and Román were dressed in plain clothes and did not display their weapons during the initial meeting with the defendants.

During this conversation, Negrón asked both defendants if he could see their airline tickets and identification. Negrón re-

viewed the tickets and confirmed that they were one-way tickets from Miami, bought with cash and purchased on the same day of their flight. Negrón returned to the couple their identification and airline tickets. Negrón also asked the defendants the purpose of their trip; they replied that they had gone to Miami for a vacation. The defendants explained that they had planned the trip for a long time, that although they did not know anyone in Miami, they went to see the area. Soto and Alvarado also noted that they only stayed in Miami for two days, since they ran out of money. Negrón then asked if he could look inside Alvarado's briefcase, and Alvarado consented. Soto handed Negrón the keys for the briefcase. The contents of the briefcase revealed four hundred dollars ($400.00) in U.S. currency. When Negrón asked the defendants why they had said that they had run out of money, defendants failed to reply. Alvarado started sweating, looking around and shaking his hands.

Agent Negrón also noticed that Alvarado had difficulty bending at the waist and observed a bulge underneath Alvarado's sweatshirt. Negrón asked Alvarado whether he had anything under his shirt. Alvarado replied that he had nothing underneath and voluntarily lifted up his sweatshirt to reveal a white tee-shirt. At that time, the agents detected that Alvarado was concealing something underneath his tee-shirt, and Negrón lightly touched the bulge from the exterior of defendant's tee-shirt. Alvarado replied that he wore a girdle.

Negrón then requested Alvarado and Soto to accompany him to the DEA office. The defendants posed no objection and followed the agents to the office. Shortly after arriving to the DEA office, the agents brought a K–9 dog to examine Alvarado. The K–9 did not examine Soto, who was in a different room from Alvarado and was attending the child. Upon sniffing Alvarado, the K–9 detected the presence of a controlled substance on his body.

At that point, the agents informed Alvarado and Soto that they were under arrest and read them their Miranda warnings. After Soto arranged to deliver the child to family members, a female agent searched her. A search of both defendants revealed that they were carrying approximately two (2) kilograms of heroin.

After their arrest, Alvarado agreed to cooperate with the DEA. Alvarado told Agent Negrón that he was supposed to deliver the heroin to one Carlos Cabrera–Polo ("Cabrera"). Alvarado explained that he had to call Cabrera to arrange the delivery of the drugs. Alvarado agreed to make a controlled telephone call to Cabrera and spoke to a person which Alvarado later identified as Cabrera. During the phone conversation, Cabrera noted that he would pick up Alvarado at the Luis Muñoz Marín International Airport at the same place where he had met Alvarado previously. Cabrera explained that he would arrive to the airport in ten minutes.

Soon after, Cabrera arrived at the airport in a green Mitsubishi Mirage vehicle; at that point, Alvarado identified the driver in the Mirage as Cabrera, the person to whom he was supposed to deliver the two kilograms of heroin. Alvarado waited for Cabrera at the airport's arrival ramp area. Cabrera failed to see Alvarado and thus drove past Alvarado and away from the airport. Several DEA agents, who began a surveillance of Cabrera upon his arrival to the airport, followed him to a house at # 118 Tapia Street in Santurce, Puerto Rico.

Alvarado then placed a second call to Cabrera and told him he was still waiting.

Simultaneously with this call, DEA agents observed Cabrera speak on his cellular phone. After the phone conversation, Alvarado informed Agent Negrón that Cabrera would return to the airport. While Alvarado was waiting, another individual named Gregorio Curtin–Perdomo ("Curtin") arrived at the airport. As soon as Curtin picked up Alvarado, he was arrested and subsequently released. Cabrera arrived a second time to the airport but once again failed to detect Alvarado and left again. Alvarado made a third call and told Cabrera to hurry up because he was getting nervous because of the packages.[1] Cabrera replied that he had sent Curtin to pick up Alvarado. Alvarado responded that he had not seen Curtin.

Shortly thereafter, Cabrera returned to the airport. This time he found Alvarado. He and Alvarado met and talked briefly. Cabrera opened the trunk of his green Mirage. While Alvarado was placing his bags in the trunk, the agents arrested Cabrera, who was seated in his car. DEA agents immediately searched the interior of the car and found a cellular phone and papers. Curtin, upon his release from DEA's custody, informed the agents that Cabrera and Cabrera's wife had been living for one month in one of the bedrooms in his home. Curtin also said that Cabrera was not paying rent. Curtin then gave written consent to search his house at # 118 Tapia Street in Santurce. This written consent read, in pertinent part: "I hereby authorize you to search all of the areas including the kitchen, the living room, and the bedroom ... I am the per-

---

1. The Government has filed a motion to correct Agent Negrón's testimony regarding the misuse of the word "packages." A review of the official translation reveals that the word "packages" was not used in the conversations between Alvarado and Cabrera. Based on this correction, Cabrera seeks to reopen the suppression hearing and suppress the evidence against him. Cabrera argues that the reference to "packages" was an euphemism for the drugs and thus the agents relied on that euphemism to establish probable cause against Cabrera. Accordingly, without the reference to that euphemism, the agents could not establish probable cause to arrest Cabrera. Although the Court acknowledges that Agent Negrón should have been more careful with the use of the term "packages" in his testimony, we believe there is other evidence to support the probable cause determination against Cabrera, as will be explained below. Accordingly, Cabrera's motions to reopen the suppression hearing and to suppress evidence are **DENIED**. (Dockets # 51, 77)

son responsible and I have control of the house."

Pursuant to such consent, the agents and Curtin went to his house. Upon arrival, DEA agents asked Cabrera's wife if they could search the bedroom which she and her husband occupied. Cabrera's wife said they could search whatever they wanted. A search of Cabrera Polo's bedroom uncovered a "money gram," electronic money transfer receipts, a pager, and some drug paraphernalia. The agents found those items in a plastic bag inside an open box. The agents also found $2,900 in U.S. currency in a clear plastic bag on top of a desk.

For purposes of clarity, the Court will analyze the arguments of Alvarado and Soto separately from the legal contentions posed by Cabrera. Defendants Soto and Alvarado argue that Negrón's initial detention constituted an arrest without probable cause, and that the questioning during that detention constituted "custodial interrogation." Accordingly, defendants argue that the statements and evidence obtained pursuant to that detention and the subsequent questioning are inadmissible as "fruits of the poisoned tree." We proceed to examine defendant's contentions.

### Applicable Law/Analysis

### Investigatory Stop/Reasonable Suspicion

■ Defendants claim that Agent Negrón's initial questioning of the defendants in the main terminal area prior to their formal arrest constituted a "custodial interrogation" which triggered the obligation to read defendants their Miranda rights. Consequently, defendants Alvarado and Soto seek to suppress their statements prior to their arrest at the DEA office, as well as the evidence obtained subsequent to the arrest, pursuant to the agents' failure to provide the constitutionally-required Miranda warnings. The Court must determine whether agent Negrón's questioning of the defendants at the main terminal area constituted an investigatory stop, and thus did not require the agent to read

Miranda warnings, or whether the agents' behavior towards defendants constituted a *de facto arrest*, which would trigger the Miranda rights.

The First Circuit Court of Appeals has spoken repeatedly on the distinction between an investigatory stop and an arrest. See *U.S. v. Young*, 105 F.3d 1 (1st Cir. 1997). In *Young*, two police officers, while patrolling a section of Boston, received a radio message describing three individuals suspect of armed robbery. Several blocks from the last reported location of the suspects, the officers noticed a group of three men standing together. When the group detected the unmarked cruiser, the group dispersed in separate directions. When the police noticed that one of the men's height and clothing matched the profile of one of the robbery suspects, they drove their car next to the man, Dwayne Young, and asked him "if he had a minute," to which Young assented. Once one of the officers detected a gun in Young's waistband, he lunged towards the defendant, and made fleeting contact with his jacket or belt, but failed to either grab the gun or detain him. Young fled from the police, who eventually detained him.

At trial, Young sought to suppress the gun, claiming that the officer's "got a minute" question and contact with the defendant constituted a *de facto* arrest without providing adequate Miranda warnings. The district court determined that the officer's question and minimal contact did not constitute a *de facto arrest* and denied the motion. Upon appeal, the First Circuit upheld the denial of the motion to suppress. The First Circuit explained: "Interaction between law enforcement officials and citizens generally falls within three tiers of Fourth Amendment analysis, depending on the level of police intrusion into a person's privacy. The first or lowest tier encompasses interaction of such minimally intrusive nature that it does not trigger the protections of the Fourth Amendment. The Supreme Court has repeatedly emphasized that not all personal

intercourse between the police and citizens rises to the level of a stop or seizure. *See Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991) (citing cases). Police may approach citizens in public spaces and ask them questions without triggering the protections of the Fourth Amendment (citations omitted)." Id. at 5–6.

The Court in *Young* continued: "The remaining two tiers of Fourth Amendment analysis comprise *de facto arrests* requiring probable cause, and lesser seizures generally known as investigative or *Terry* stops, which require a lesser reasonable suspicion. An arrest occurs when an officer, acting on probable cause that an individual has committed a crime, detains that individual as a suspect. Probable cause exists when police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe the suspect had committed or was committing a crime (citations omitted) An investigative stop, also known as a *Terry* stop, *see Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), occurs when a police officer, acting on reasonable and articulable suspicion of criminal activity, briefly detains an individual to confirm or dispel his suspicion." *Id.* at 6, 88 S.Ct. 1868 (citing *U.S. v. McCarthy*, 77 F.3d 522, 529 (1st Cir.1996)).

With regards to investigative stops, the Court must determine "not whether the police had probable cause to act, but instead whether the actions taken were reasonable under the circumstances." *Id.*

The Court must first conclude whether the officer's action was justified at its inception. If the action is justified, the Court must then ask whether the action taken was reasonably related in scope to the circumstances which justified the interference. *Id.* To satisfy the first prong, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Young* at 7 (citing *U.S. v. Kimball*, 25 F.3d 1, 6 (1st Cir.1994)). To fulfill the second prong, the Court must examine the totality of the circumstances. *See United States v. Walker*, 924 F.2d 1, 4 (1st Cir. 1991); see also *U.S. v. Acosta–Colón*, 157 F.3d 9, 14 (1st Cir.1998).[2]

Based on the abovementioned case law, we conclude that Agent Negrón's brief detention and subsequent questioning of defendants Omar Alvarado–Rodríguez and Rosa Soto–Encarnación constituted an investigatory stop, pursuant to *Terry v. Ohio*, which did not trigger the Miranda rights. As noted above, Agent Negrón below had ample evidence to intervene with the defendants to dispel his suspicion regarding possible criminal activity. The agent had garnered information from Agent Orlando Báez and the anonymous tip which unequivocally identified two heroin couriers traveling with a small child, named Omar Alvarado and Ivette Soto. He verified the identities of the two alleged couriers with the flight information officers of American Airlines and their physical profile from the flight attendant.

**2.** Defendants rely at length on *Acosta–Colón* to support their arguments for suppression. Although the facts of the case seem similar on the surface, a closer scrutiny reveals substantial difference. In *Acosta–Colón*, defendant Acosta–Colón was detained by customs inspector, and along with two other defendants was handcuffed, brought to a customs enclosure area, patted down and transferred to an interrogation room, where Acosta–Colón remained handcuffed. After 15 minutes in the room, a customs inspector saw him trying to swallow some piece of paper. Once the in-

spector examined the paper which incriminated Acosta–Colón, the inspector advised Acosta–Colón of his Miranda rights and arrested him. The Court of Appeals reversed the denial of his motion to suppress, holding that the handcuffing exceeded the limits of a lawful *Terry* stop. 157 F.3d at 19. There is no indication in the present case that the agents exerted restraints of such magnitude. Another case often cited, *U.S. v. Griffin*, 7 F.3d 1512 (10th Cir.1993) involved extensive questioning prior to the arrest, whereas in the present case the questioning was very limited.

Furthermore, Agent Negrón and Task Force Agent Román established surveillance upon the couple shortly after their arrival from flight 709, and were able to confirm the defendants' profile as described by the anonymous tip, by Báez and the flight attendant. This evidence was sufficient to provide the agent reasonable suspicion required to engage in an investigatory stop of defendants Alvarado and Soto.[3]

■ Defendants claim they were not free to leave, since they were surrounded by agents with their guns drawn when Agent Negrón initially intervened with them. However, officer Negrón testified that he never withdrew his gun from his holster at any time during his questioning. Furthermore, it is well-established law that the use of guns and the presence of more than one police officer do not necessarily convert an investigative stop into an arrest. *See U.S. v. Maguire*, 918 F.2d 254, 259 (1st Cir.1990).

■ The First Circuit recently explained in *Young:*

> We have recently rejected the contention that every incidence of physical contact, even *de minimis*, between a police officer and a citizen, constitutes an arrest requiring probable cause. *See Zapata* 18 F.3d at 977 (indicating that police touching of an individual does not necessarily elevate a seizure to an arrest.) Parsing whether any given seizure constitutes an arrest or a lesser seizure, however, proves a difficult task.

See *id.* at 975 (explaining that no scientific formula exists to distinguish between investigative stops and arrests.) Police conduct will rise to the level of an arrest when " 'a reasonable man in the suspect's position would have understood his position' in the circumstances then obtaining, to be tantamount to being under arrest." See *id.* (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)) *Young*, 105 F.3d at 7.[4]

The Court in *Young* identified several factors that could transform a non-arrest seizure to a *de facto* arrest requiring probable. These included: 1) extending an investigative stop beyond the time necessary to confirm or dispel reasonable suspicion, and 2) physically blocking the suspect's exit such that a reasonable person would not feel free to leave. *Id.* at 7–8. Above all else, the First Circuit stressed the fact-specific nature of the inquiry. In *Kimball*, 25 F.3d at 6, the First Circuit explained that "whether police activity is reasonable in any particular context depends on the facts which are unique to that incident."

Upon review of the totality of the circumstances, the Court concludes that the initial detention of defendants Alvarado and Soto and Agent Negrón's subsequent questioning regarding their identification, travel schedule, plane tickets and remaining vacation funds did not constitute a *de facto* arrest, but was rather an investigatory stop designed to dispel the agent's rea-

3. The First Circuit noted in *United States v. Meade*, 110 F.3d 190, 193 (1st Cir.1997): "Under the 'fellow-officer' rule, law enforcement officials cooperating in an investigation are entitled to rely upon each other's knowledge of facts when forming the conclusion that a suspect has committed or is committing a crime. See *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965) ... Thus, when a law enforcement officer with information amounting to probable cause directs an officer who lacks the knowledge to make the arrest, we 'impute' to the arresting officer the directing officer's knowledge. (citations omitted)"

4. Alvarado also argues that he was "seized" without probable cause when he was touched in the waist by Agent Negrón when he lifted his sweatshirt. In view of the light touching and the brief period during which this activity occurred (one second, according to Negrón), we find the contact was *de minimis* and thus does not qualify as a "seizure." Furthermore, it resembles more a "pat down" pursuant to a Terry stop to dispel any suspicion of concealed weapons.

sonable suspicion regarding suspected criminal activity. The questions were brief and were not designed to compel incriminatory answers. A reasonable person would not think that these questions were particularly intimidating.

■ Even assuming *arguendo* that Negrón or any other nearby agents had their guns drawn, the presence of guns does not, without more, transform the detention into a *de facto arrest.* Although the defendants may have felt apprehensive towards the agents during the initial questioning, the generic nature of the questioning and the fact that such questioning took place in a public area leads us to conclude that such conduct resembles more an investigatory stop as explained in *Berkemer v. McCarty* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). The initial questioning was just long enough to confirm Agent Negrón's reasonable suspicion that the defendants were drug couriers. As noted above, he proceeded to arrest them only after the K–9 detected the presence of a controlled substance in Alvarado's body.

Accordingly, we conclude that Agent Negrón's brief questioning was justified at its inception, in view of his collective knowledge of the parties' identities and possible motives for traveling to Puerto Rico. We note that Agent Negrón conducted his questioning in a casual manner, without yelling or forcibly restraining the defendants. He questioned each of the defendants to dispel the reasonable suspicion he may have harbored towards each of them. Only after he had properly identified the identity of the defendants, assessed the contradictory statements regarding their lack of funds and observed Alvarado's suspicious bulge around his waist, he proceeded to request defendants to accompany him to the DEA office. Defendants agreed to Negrón's request and willingly went to the DEA office. Notwithstanding Alvarado's claim that he was handcuffed to a chair at the DEA office, the agent's testimony at the hearing belies these assertions. Defendants Alvarado

and Soto remained within the non-custodial confines of the DEA office until the K–9 detected a controlled substance within Alvarado's person. At that time, Agent Negrón had probable cause to believe that defendants had committed a crime and proceeded to arrest them.

Accordingly, we find that Agent Negrón conducted an investigatory stop when he initially approached the defendants, and that there was no need for Miranda warnings prior to his questioning and their eventual arrest.

**Probable Cause for Arrest**

■ Defendants Alvarado and Soto also argue that the agents also lacked probable cause to arrest each of them, since the responses given by the defendants did not constitute sufficient justification to arrest them. We disagree.

The First Circuit explained the requirements for a warrantless arrest in *United States v. Meade* 110 F.3d 190, 193 (1st Cir.1997). In *Meade,* the Court noted: "[a] warrantless arrest requires probable cause, the existence of which must be determined in light of the information that law enforcement officials possessed at the time of the arrest". *See United States v. Diallo,* 29 F.3d 23, 25 (1st Cir.1994) 'Probable cause exists when police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe the suspect had committed or was committing a crime.' *Young,* 105 F.3d at 6. "To establish probable cause, the government 'need not present the quantum of proof necessary to convict.' (citing *United States v. Uricoechea–Casallas,* 946 F.2d 162, 165 (1st Cir.1991))."

As noted above, Agent Negrón was armed with his fellow officer's collective knowledge regarding the identities of defendants Alvarado and Soto, as well as his subsequent independent verification. He also had reliable information regarding the location of their arrival from Miami and the infant which accompanied them. He

addressed each defendant individually and proceeded to arrest them once he confirmed his reasonable suspicion that the defendants were transporting a controlled substance within their bodies. The defendants uttered a series of contradictory statements in response to the agent's queries: defendants first claimed that they had planned for a long time to visit Miami, but only stayed two days; although they did not know anyone in Miami, they went to see the area; finally, although they claimed to have run out of money, the agent's search of Alvarado's briefcase, a search to which he consented, revealed $400.00 in U.S. currency, a sum they were unable to explain.

Furthermore, Alvarado's bulging waist, which prompted Agent Negrón's gentle prodding around that area, further aroused the agent's reasonable suspicion. Prompted by his reasonable suspicion, Agent Negrón requested, and defendants agreed, to accompany him to the DEA office. Once the K–9 detected a controlled substance in Alvarado's body, Agent Negrón's reasonable suspicion crystallized into probable cause for the defendants' arrest.

Agent Negrón's collective knowledge of the defendants' identity, his confirmation of their identities, their inconsistent answers and the suspicious bulge around Alvarado's waist, provided Agent Negrón with sufficient reasons, taken together, to establish probable cause for their arrest.

The Supreme Court has clearly stated that probable cause must exist with respect to each person arrested, and a person's mere proximity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person. *See Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979). *See also United States v. Sepulveda*, 102 F.3d 1313 (1st Cir.1996). Consequently, defendant Soto argues that mere familiarity or kinship with other people for whom there is probable cause to arrest is not sufficient to establish probable cause against her. We

must assess not only her mere proximity to Alvarado, but her relationship to him at the time of the arrest. In the present case, Agent Negrón was armed with the collective knowledge of his fellow officer that a couple identified as Omar Alvarado and Ivette Soto would be arriving on a flight from Miami to San Juan with a small child, allegedly transporting heroin. After ascertaining the presence of the couple in the arriving plane with American Airlines officials and obtaining a detailed physical profile from airline officials prior to arrival, Agent Negrón identified the couple with the small child immediately upon their arrival from Miami, and confirmed the profile supplied by the anonymous tip, Orlando Báez and airline officials.

Furthermore, Agent Negrón testified at the hearing that he directed his questions toward both Alvarado and Soto. Although Alvarado answered most of the questions addressed to the couple, Agent Negrón observed Soto's demeanor throughout the questioning; Soto seemed nervous and looked around repeatedly; she briefly walked away and then came back. In view of her demeanor to the general questioning directed toward her and her companion, Alvarado, the agent assessed her demeanor, along with the seemingly inconsistent statements proffered by Alvarado, and concluded that she was inextricably linked with Alvarado in suspected criminal activity. As noted in *Sepulveda*, "probable cause requires only that the police have 'reasonable grounds to believe' that [defendant] had committed the crime". 102 F.3d at 1317. We find that Agent Negrón, at the time that the K–9 detected a controlled substance around Alvarado's body, had reasonable grounds to believe that Soto was also concealing drugs within her body and thus, had probable cause to arrest her. Upon review of the facts and applicable law, we conclude that Agent Negrón had probable cause to arrest defendants Omar Alvarado Rodriguez and Rosa Soto Encarnación.

## Suppression of Statements During Agent Negrón's Questioning

■ Defendants argue that the Fifth Amendment protection against self-incrimination precludes the government from using statements elicited from a suspect during a custodial interrogation if those statements were extracted without a prior warning. *Illinois v. Perkins*, 496 U.S. 292, 110 S.Ct. 2394, 2397, 110 L.Ed.2d 243 (1990), *quoting Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). For the Fifth Amendment protection to come into play, however, the statements must be the result of a *custodial interrogation*.

■ A defendant is said to be in *custody* when he or she is either subjected to a formal arrest or restrained to the degree usually associated with a formal arrest. *United States v. Fernández Ventura*, 85 F.3d 708, 709 (1st Cir.1996), *quoting Thompson v. Keohane*, 516 U.S. 99, 116 S.Ct. 457, 465, 133 L.Ed.2d 383 (1995); *Stansbury v. California*, 511 U.S. 318, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293 (1994). To determine whether a particular restraint on freedom of movement meets this test, the Court "must examine all the circumstances surrounding the interrogation. This test is objective: the only relevant inquiry is 'how a reasonable [person] in the suspect's shoes would have understood this situation'." *Fernández Ventura*, 85 F.3d at 711, *quoting Stansbury*, 114 S.Ct. at 1529.

■ Among the factors which are usually taken into account in determining whether a defendant was in custody are: (a) whether he was questioned in a familiar or neutral surrounding; (b) the number of law enforcement agents that were present at the scene; (c) the degree of physical restraint which was placed upon the subject, i.e., whether the subject was free to leave; (d) and the duration and character of the interrogation. *Fernández Ventura*, 85 F.3d at 711, *quoting United States v. Masse*, 816 F.2d 805, 809 (1st Cir.1987).

■ A defendant is, on the other hand, said to be under *interrogation* when he or she is subjected to "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Fernández Ventura*, 85 F.3d at 711, *quoting Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). As with the custody determination, the test is objective: the Court must determine whether a reasonable person would, given the same circumstances, perceive such questioning to constitute an attempt to elicit an incriminating response. *Fernández Ventura*, 85 F.3d at 711 (*quoting United States v. Taylor*, 985 F.2d 3, 7 (1st Cir.1993)).

Since the Court has concluded that neither Omar Alvarado–Rodríguez or Rosa Soto Encarnación were under custody at the time that Agent Negrón questioned the defendants at the terminal area and later at the DEA office, and since Agent Negrón had reasonable suspicion to question them and subsequent probable cause to arrest them, we need not discuss whether the statements or evidence obtained prior to their arrest should be suppressed as "fruits of the poisonous tree."

## Reasonable Suspicion and Probable Cause to Arrest and Search Carlos Cabrera–Polo

■ In the present case, there is ample evidence to justify the necessary probable cause to arrest Cabrera. Agent Negrón had seized approximately two kilograms of heroin from codefendants Alvarado and Soto. Alvarado informed Negrón that he intended to deliver the drugs to Cabrera. Alvarado engaged in three monitored telephone conversations where he requested Cabrera to pick him up. As noted previously, the DEA agents confirmed through their surveillance that Cabrera was speaking on his cellular phone to Alvarado.

Furthermore, Alvarado informed Negrón and the DEA agents that Cabrera would be driving a green Mirage, a description which the agents were able to confirm not once, not twice, but three times, as Cabrera drove by the airport several times to meet with Alvarado. In view of the detailed description of Cabrera provided by Alvarado, the phone conversations which confirmed Alvarado's relationship with Cabrera, the precise description of the car which Cabrera drove to pick up Alvarado and the independent confirmation of this information by Agent Negrón and the DEA agents, the Court finds that there was sufficient probable cause to arrest Cabrera.

 Cabrera's argument that the evidence obtained from his car should be suppressed is also without merit. The First Circuit has long held that a search incident to arrest will ordinarily fail to trigger the protections of the Fourth Amendment. The Court in *United States v. Sheehan,* 583 F.2d 30 (1st Cir.1978) cited *United States v. Edwards,* 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974), to support this legal axiom, noting that "the Supreme Court has made it increasingly clear that a lawful arrest justifies a special latitude of both search and seizure of things found on the arrestee's person." *Id.* at 32. The First Circuit continued: "[t]he breadth of the power of warrantless seizure in cases of search incident to lawful arrest is suggested by the concluding passage in *Edwards,* 415 U.S. at 808–09, 94 S.Ct. at 1239:

In upholding this search and seizure, we do not conclude that the Warrant Clause of the Fourth Amendment is never applicable to postarrest seizures of the effects of an arrestee. (footnote omitted) But we do think that the Court of Appeals for the First Circuit captured the essence of situations like this when it said in *United States v. DeLeo,* 422 F.2d 487, 493 (1970) (footnote omitted)":

'While the legal arrest of a person should not destroy the privacy of his premises, it does for at least a reasonable time and to a reasonable extent take his own privacy out of the realm of protection from police interest in weapons, means of escape, and evidence.'

*Id.*

As previously discussed, the agents in the present case had sufficient probable cause to arrest Cabrera. Accordingly, the search of his car, which yielded the cellular phone and papers, was incidental to his arrest and thus is not subject to constitutional challenge. *See also U.S. v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981).

**Search of Cabrera's Bedroom**

 The Fourth Amendment, as a general rule, prohibits the warrantless entry into a person's home to search for specific objects. *Minnesota v. Dickerson,* 508 U.S. 366, 113 S.Ct. 2130, 2136–37, 124 L.Ed.2d 334 (1993). Nevertheless, this prohibition does not prevent law enforcement officials from searching someone's home if: 1) the defendant or, 2) a third party who possessed common authority over the home or 3) a third party who has a sufficient relationship with the searched home gives voluntary consent to search the home. *U.S. v. Matlock,* 94 S.Ct. 988, 993 (1974); *U.S. v. Donlin,* 982 F.2d 31, 33 (1st Cir.1992).

The government argues, and this Court agrees, that the agents obtained an intelligent and voluntary consent to search the home where Cabrera had been staying. At the time of his arrest, Cabrera was staying in a bedroom at # 118 Tapia Street in Santurce, Puerto Rico. However, the owner of # 118 Tapia was Gregorio Curtin Perdomo ("Curtin"). Curtin informed the DEA agents that Cabrera and Cabrera's wife and infant had been occupying a bedroom in his home. Curtin also stated in a written statement that Cabrera was not paying rent and that he, Curtin, had control over the entire house. Finally, Curtin gave written consent to search his entire house. In this written consent he indicat-

ed that he was giving his consent freely, voluntarily and without any coercion or threat.

Moreover, DEA agents asked Cabrera's wife if they could search the room where they had been staying. She gave her consent and indicated to the agents that they could search whatever they wanted. In view of the evidence before us, the Court finds that the agents seized the evidence from Cabrera's room pursuant to a voluntary and consensual search, and thus the evidence will not be suppressed.

In view of the above, the motions to suppress filed by defendant Rosa Soto Encarnación (Docket # 30), Omar Alvarado Rodriguez (Docket # 31) and Carlos Cabrera Polo (Docket # 34) are. **DENIED.**

**SO ORDERED.**