**UNITED STATES of America,
Plaintiff,**

v.

**Angel MORA–CABRERA, Alberto Ramon, Edgardo Velez–Saldaña, Jose A. Cedeño–Castillo, Defendants.**

**No. CRIM. 98–088(SEC).**

United States District Court,
D. Puerto Rico.

July 30, 1999.

---

Guillermo Gil, U.S. Atty., San Juan, PR, Mark Irish, Asst. U.S. Atty., San Juan, PR, for U.S.

Francisco M. Dolz–Sanchez, San Juan, PR, for Defendant Edgardo Velez–Saldana.

Ramon N. Gonzalez–Santiago, San Juan, PR, for Defendant Alberto Ramon.

Ricardo Izurieta–Ortega, San Juan, PR, for Defendant Angel Mora–Cabrera.

Joseph C. Laws, AFPD, San Juan, PR, for Defendant Cedeno–Castillo.

## OPINION AND ORDER

CASELLAS, District Judge.

Defendants Angel Mora–Cabrera, a/k/a "Ramón De La Cruz,"[1] Alberto Ramón, Edgardo Vélez–Saldaña, and José A. Cedeño–Castillo[2] were arrested without a warrant on March 29, 1998, in connection with the seizure of approximately 953.9 kilograms of cocaine in Guayama, Puerto Rico. On April 21, 1998, they were indicted with aiding and abetting each other in the possession with intent to distribute cocaine (Docket # 16).

Challenging that there was no probable cause to support their arrests, defendants moved to suppress all evidence subsequently obtained from them (Dockets # 51, # 53, and # 57).[3] A three-day hearing on defendants' motions was held. Post-hearing briefs were filed (Dockets # 78, # 80, and # 85), and the matter was properly submitted to the Court.[4] In their briefs, defendants argue that law enforcement officials lacked both the reasonable suspicion needed to stop them, as well as the required probable cause for their arrests. Accordingly, they seek to suppress all the evidence subsequently obtained from them as "fruit of the poisonous tree." For the reasons set forth below, the Court now **DENIES** defendants Angel Mora–Cabrera, Edgardo Vélez–Saldaña, and José A. Cedeño–Castillo's motions (Dockets # 51 and # 57), and **GRANTS IN PART** and **DENIES IN PART** defendant Alberto Ramón's (Docket # 53).

**Factual Background**

At about 12:20 a.m., on Sunday, March 29, 1998, Puerto Rico Police Department (PRPD) Officers José M. Vélez and Miguel A. Rivera began their preventive patrol at the Maritime Unit .in Guayama, Puerto Rico. They were riding in a PRPD official vehicle driven by Officer Vélez. The Guayama Maritime Unit is a police headquarters located in Punta Pozuelo, or Pozuelo Ward, a peninsula encompassing various sectors, among which is Los Limones. At the suppression hearing, Officer Vélez described Los Limones as an "isolated," and "swampish" area with "little alleyways and paths into the mangrove[s]" (Docket # 72, at 9). It was also established at the suppression hearing that Los Limones is a "well-known drug smuggling area" (Docket # 74, at 464).[5]

At about 12:45 a.m., Officers Vélez and Rivera spotted a "green colored mini van type vehicle," (Docket # 72, at 11), com-

---

1. Defendant's real name is Ramón De La Cruz Castro (Docket # 73, at 174–76). However, we shall refer to him by the name appearing in the indictment: Angel Mora–Cabrera.

2. Although defendant's last name is not Cedeño–Castillo but Cedano–Castillo (Docket # 78, at 1), we shall refer to him by the former, as it is how it appears in indictment.

3. Defendant Mora–Cabrera did not individually move to suppress, but was allowed to adopt defendants Vélez–Saldaña and Cedeño–Castillo's motions (Dockets # 58 and # 64).

4. Defendants Mora–Cabrera and Ramón did not file separate briefs, but were allowed to join co-defendants' (Docket # 81 and # 87).

5. During the hearing, counsel for defendant Mora–Cabrera unavailingly tried to establish that Los Limones was know for alien- smuggling (Dockets # 72, at 24–25, 49; Docket # 74, at 464).

ing out of an alleyway into the main road. Id. at 9. The van had only the parking lights on, and was proceeding slowly. Id. Apparently at the sight of police, the van turned the headlights on, and started to flee. Id. at 10. A chase immediately ensued. Id. at 11.

During the chase, Officer Vélez saw a person jump out of the van and run into the mangroves. Id. Officer Vélez, however, decided not to stop to apprehend this person, and instead continued to pursue the van. Id. at 12, 29. The van apparently lost control and went over some rocks. Id. At that point, Officer Vélez was able to see the driver also jump out. Id. The van hit some trees and the officers finally caught up with it. Id. at 11, 81. Officer Vélez searched the van, ultimately finding "a bunch of bales placed in the back," id. at 12, which were later known to contain cocaine. Several officers arrived at the scene thereafter. In all, the chase allegedly did not last more than a minute. Id. at 27, 97.

Regarding the fleeing suspects, Officer Vélez simply described them as "two silhouettes." Id. 12. Officer Rivera more precisely described the first person who jumped out of the van as wearing dark pants and a "sweater [which] had some white on it," id. at 82, a "stripe" which "[s]eemed to be white." Id. at 91. Officer Rivera, however, did not see any other person come out of the van (**Docket # 72, at 81–82**). Within approximately ten hours following this incident defendants were apprehended.

**Intervention with Defendant Angel Mora–Cabrera**

Sergeant Miguel Rodríguez De Jesús and Agent Octavio R. LaKing, both from the PRPD, were among the officers who arrived at the site of the seizure. They came in response to a radio call which relayed the intervention with the van. Id. at 41. There, Sergeant Rodríguez met

with Officers Vélez and Rivera. The latter informed that "an individual had come out of th[e] van who was dressed in dark pants." Id. at 41, 59.

Upon leaving the scene, Sergeant Rodríguez and Agent LaKing drove around Los Limones, sometimes going over to the Maritime Unit. Id. at 41. They were riding in a police vehicle driven by Agent LaKing. Id. at 71–72. According to Sergeant Rodríguez, at about 3:15 a.m., while taking a curve on the main road, they saw a "person ... dressed in black pants and a sweater," who, apparently upon noticing their presence, started to run, id. at 74, crossed in front of their vehicle and "went into the mangrove[s]." Id. at 42. Sergeant Rodríguez and Agent LaKing stepped out to chase after him. Id. At that point, PRPD Officers Angel Morales Amato and Pedro Robles arrived, "based on a call ... [that they] received from ... the federal U.S. Customs Service ... [that they] should come to the area of Guayama." Id. at 100.

Sergeant Rodríguez and Officer Morales went into the mangroves to search for the individual, and found him lying under some roots. Id. at 106, 112. They pulled him out grabbing him by the arms, and walked him ten to fifteen feet away from his hiding place back to the main road. Id. at 111–12. Defendant did not resist. Id. at 70, 111. As he was being brought out, the man volunteered, id. at 52, "that he was hungry, that he had been lost for 11 days, and that he had come from Santo Domingo with several others." [6] Id. at 42. Immediately after these statements, Sergeant Rodríguez placed the man under arrest. Id. at 42.

Sergeant Rodríguez testified that he did not believe the man's story because "he was well dressed;" had a "very well trimmed," "goatee type of beard;" was wearing expensive "Nike sneakers;" and he "looked very well." Id. at 43. According to him, if that person "had been lost

---

**6.** While Sergeant Rodríguez did not include in his official report of the incident any information concerning the suspect's statements, id. at 52, he did so in his notes. Id. at 78.

for 11 days, he would have [had] beard growths and things ..." Id. Moreover, based on the man's statements and on his lack of identification, Sergeant Rodríguez determined that he was illegally in the United States. Id. at 44.

Although the intervening law enforcement officials were armed, they did not display their weapons at any time during the intervention with defendant. Id. at 107, 110. At some point, the man identified himself as Ramón De La Cruz Castro, id. at 45, herein defendant Angel Mora–Cabrera.

After being arrested, Mora–Cabrera was taken to the Maritime Unit. Id. at 42. He was later transported to the U.S. Customs Service facility in San Juan, where he was interviewed by Agent Joe Ruiz (**Docket #74, at 417, 480**). Defendant generally told Agent Ruiz that he had recently arrived in Puerto Rico by sea as an illegal alien, along with seventy other nationals from the Dominican Republic. Id. at 480–82, 484–85, 488, 492.

**Intervention with Defendant Edgardo Vélez–Saldaña**

At about 8:00 a.m. that day, PRPD Officers Jorge L. Guzmán and José R. Meléndez reported for service at the Guayama Maritime Unit (**Docket #73, at 208**). Upon arriving they were informed that a shipment of forty-two bales of cocaine had been seized in Los Limones, and that some people were under arrest. Id. at 209–10, 250. They were instructed to go to Los Limones "to provide support to the units that were cooperating in the investigation." Id. at 250. They were not given any information about the suspects' general description, nationality or number. Id. at 251.

About half an hour later, as Officers Guzmán and Meléndez were heading to Los Limones driving down State Road 7710, they spotted defendant Vélez–Saldaña coming out of the mangroves. Id. at 210. The area where defendant was seen is an "isolated" area with "no residences."

Id. at 235. According to Officer Guzmán, they decided to intervene with defendant, because they "didn't know him and . . . [they] had reason to believe that he was not from around there." Id.; see also id. at 211, 281. As officer Guzmán explained: "The ... [Pozuelo] area is a very small area regarding population, and the opportunity that I have had of working two years in that area, and I had never seen him around there. And the area where we saw him for the first time did not lead us to believe that he was a person who used to be around there a lot." Id. at 251. Acting on this belief, the officers stopped their vehicle next to defendant, and stepped out to interview him. Id. at 211, 241, 281. Their belief that defendant was not from around that area did not initially lead them to connect him to the drug load. Id. at 251. It was what transpired during the interview what led them to conclude so.

Officer Meléndez, who was dressed in uniform and carrying his service weapon, id. at 281, told defendant to stop. Defendant complied, and the officer immediately began to question him. Id. at 242. Officer Meléndez first asked defendant where he was from, and he responded that he was from Puerto Nuevo. Id. at 278, 281. Officer Meléndez then asked him what he was doing in that area, id., and he said that he was there to eat. Id. at 281. There was some inconsistency at the hearing as to what exactly did defendant tell the officers. At one point Officer Guzmán testified that defendant said that "he was going to have breakfast," but then he stated that defendant said that "he had had breakfast." Id. at 211, 215. Officer Meléndez testified that defendant said that he had come to the Pozuelo Ward to eat. He did not mention, however, whether defendant had already done so when he was apprehended. Id. at 281–82, 292.

Defendant claimed, moreover, that one Danny had dropped him off at the entrance of the Pozuelo Ward, and that this person would later return to pick him up.

Id. at 211, 281, 283, 291–92. Officer Guzmán remembered defendant saying that he was heading to the Salinas motordrome. Id. at 211, 252. He allegedly stated that "his friend, Danny, was at the Salinas ... [motordrome] and that he was going ... [there] to pick up his motorcycle, that an individual had his motorcycle over there, some guy named Luis Bejuco." Id. at 217. Officer Guzmán allegedly remembered inquiring from defendant that "if he was heading to the Salinas ... [motordrome] and [that] if his friend [had gone there], why ... [had he not gone] with him[?]" Id. at 217. However, Officer Guzmán later clarified that the only facts which transpired while questioning defendant on State Road 7710, were those relating to where he was from, whether he had any identification, what he was doing there, where was he headed to, and who had brought him there. Id. 246. Officer Meléndez's testimony indeed confirmed that all the information about the motordrome, the motorcycle, etc., was obtained from defendant at the Maritime Unit to where he was later transported. Id. at 283, 291–92. According to Officer Meléndez, at the scene of the intervention, defendant did not even "indicate where Danny had gone" to. Id. at 292.

While on State Road 7710, Officer Meléndez also asked defendant his name, but he did not say. Id. at 282. Defendant was further asked for identification, and he said he did not have any. Id. Officer Meléndez testified, nevertheless, that he "knew" that defendant was Puerto Rican. Id. at 243. Defendant later identified himself as Edgardo Javier Vélez–Saldaña. Id. at 220.

Officer Meléndez further testified that during the intervention, defendant was "sweaty" and "agitated." Id. at 281. He also noticed that defendant had mangrove root residue on his chest, and that "the lower portion of his blue jeans was wet."

Id. To this effect, Officer Guzmán testified that defendant was "dirty, that he had some leaves on him, and that his feet were wet." Id. at 215. According to Officer Guzmán, defendant said that he was dirty because "he had fallen." Id. He also mentioned that defendant "was a little like excited." Id. at 216.

At that point, Officer Meléndez told defendant to stand against the patrol car while he searched and handcuffed him. Id. at 278. Some cash and a ticket to the Salinas motordrome were obtained. Id. at 218. Defendant was read his constitutional rights and then transported to the Maritime Unit.[7] Id. at 217–28, 247, 292. According to Officer Meléndez, defendant was further questioned inside the patrol car. Id. at 279. However, neither the voluntariness nor the content of this questioning were addressed at the suppression hearing. Defendant's initial questioning on State Road 7710 lasted about fifteen minutes. Id. at 244.

According to Officer Meléndez, his suspicion about defendant's involvement in the drug shipment was heightened by the following facts:

He [defendant] tells me that he had come there to eat; however, the place that he came out of and where we saw him, where we had the intervention with him, is rather far from any establishment. So all of these elements, him being sweaty, having the mangrove residue, having his pants wet, and being far away from a supposed store where he was going to buy some food, gave me a motive for me to determine that he might have been involved and that he could be one of the individuals that had escaped during the early morning hours when the drug shipment was seized.

Id. at 282.

Officer Guzmán's reasons to connect defendant with the drug shipment were

---

7. At the Unit, Officer Guzmán again read defendant his *Miranda* rights (**Docket # 73, at** **218).**

somehow different. He testified that what led him to suspect defendant's involvement "was the fact that everything he said was contradictory."[8] Id. at 216, 246–47. First, defendant stated that he had come to Guayama from Barrio Obrero, and that he had left Barrio Obrero at about 8:00 a.m. Id. at 212. He was detained at about 8:30 a.m. As Officer Guzmán explained, if defendant had left Barrio Obrero at 8:00 a.m., it would have been impossible for him to reach Guayama by 8:30 a.m. Id. at 211–16.

Second, according to Officer Guzmán, defendant explained that he was there to eat, yet the nearest establishment where he could have done so was closed at that time. Id. at 212, 216. Officer Meléndez's testimony, however, was to the effect that defendant stated that he was *going* to eat, and that he was in fact walking towards a nearby restaurant when he was stopped. Id. at 292–93. Nevertheless, Officer Meléndez also confirmed that the restaurant was closed at that time. Id. at 293. If defendant was indeed not from around that area, he had no reason to know that the restaurant was closed at that time. Therefore, we shall not take this fact into account in our analysis.

Finally, defendant's statements about his friend Danny and the Salinas motordrome allegedly bolstered Officer Guzmán's suspicion. Id. However, since this information was obtained only after defendant's arrest, it "may not form the basis of probable cause for that arrest." *United States v. Bizier*, 111 F.3d 214, 217 (1st Cir.1997). Therefore, we shall also refrain from factoring it in our analysis.

### Intervention with Defendant Alberto Ramón

At about 8:00 a.m., PRPD Officers César Rivera–Báez and Gabriel Pérez began their shift at the Maritime Unit (**Docket # 72, at 116**). There, Officer Rivera–Báez was informed that a drug shipment had been seized in the Pozuelo area. Id. at 117. While patrolling the area, the officers met a fellow agent from the canine unit, id. at 130, who also informed them about the drug seizure (**Docket # 74, at 374**). He further informed that several suspects were at large, although he did not mention their number or give their description. Id. at 375, 399; **Docket # 72, at 151.**

Shortly thereafter, Officers Pérez and Rivera–Báez "received information over the radio that a person had been found in the area of Puente Jobos in Guayama; that … [this] person … [was] wearing blue jeans, and that there was another person with him who was a Dominican national, no description given." Id. at 117. The individual wearing blue jeans was described as also wearing either a blue shirt, id. at 123, or a blue sweater (**Docket # 74, at 375**). Officer Rivera–Báez testified that the individuals were referred to as suspects linked to the seized drugs (**Docket # 72, at 125**).[9]

At about 8:50 a.m., while driving around Puente Jobos,[10] the officers saw defendant Ramón dressed in a blue shirt and blue pants quickly cross the road and walk inside a bakery (**Docket # 72, at 118**). The fact that defendant fitted the description given over the radio made Officer Rivera–Báez suspicious. Id. at 121–22, 146–47. Therefore, he drove up to the bakery and parked the patrol car almost in

---

**8.** Defendant's dirty appearance also raised Officer Guzmán's suspicions (**Docket # 72, at 216**).

**9.** While Officer Pérez testified that these individuals were never referred to as suspects (**Docket # 74, at 393**), he acknowledged that there was a general state of alert at that time, because of the drug seizure. Id.

**10.** It should be noted that Puente Jobos is less than a ten-minute drive, and less than a forty-minute walk, from Los Limones, which is where the drug load was seized (**Docket # 73, at 262–64**).

front of it. Id. at 136. He stepped out and proceeded to go into the bakery, while his partner, Officer Pérez, who was carrying a long-barreled weapon, id. at 128, remained outside providing cover. Id. at 136. As he was walking into the bakery, Officer Rivera–Báez confirmed that defendant, who was standing in front of the counter looking at the menu with his back to the bakery's entrance, was indeed wearing a blue shirt and blue pants. Id. at 118, 137–38. Officer Rivera–Báez was also able to notice that defendant was "wet and muddy." Id. at 118. This observation prompted Officer Rivera–Báez to arrest him without first conducting a pat-down or asking any questions. Id. at 118, 154, 166. Defendant did not resist. Id. at 139. As Officer Rivera–Báez explained: "I decided to handcuff him ... because the place where the drugs were off-loaded was a mangrove [area]. In order to get away from there, he would have gotten muddy. So that is why I proceeded for my safety and for the safety of the other people there to handcuff him and bring him ... outside." [11] Id. at 166.

Officer Rivera–Báez walked defendant out of the bakery and stood next to the driver side of the patrol car. He asked defendant what was he doing there, and the latter responded that he was going to order breakfast. Id. at 118, 166. The officer then asked him where he was from, and he indicated that he was from San Juan. Id. at 118, 166. Defendant was then asked what was he doing in Guayama, to which he allegedly answered: "I came to look for some relatives who died. They were coming from Santo Domingo and they drowned in a yawl." [12] Id. at 167. During this questioning, defendant re-

mained handcuffed, and he was not searched or patted down. As Officer Rivera–Báez conceded at the suppression hearing, it was until after reading defendant his rights that he "checked him preliminarily to make sure that he didn't have anything on him ... [with which he] could harm" him. Id.; **Docket # 74, at 412.**

Officer Rivera–Báez did not believe defendant's statement that he had come to Guayama looking for his relatives, "[b]ecause if ... [defendant] was there to pick up any bodies, it's at the Forensic Sciences Institute in Río Piedras where you can pick up the bod[ies]." [13] Id. at 120. At that time, Officer Rivera–Báez "called the guys from [U.S.] Customs so they would come and observe ... [defendant] and interview him." Id. at 119. Whomever it was from the U.S. Customs Service that Officer Rivera–Báez talked to allegedly informed him to take defendant to the Maritime Unit. Officer Rivera then read defendant his constitutional rights and searched him. Id. This search produced a cellular phone and wallet containing some identification, but no money. Id. at 119–20, 124–25. During the search, Officer Rivera–Báez was also able to confirm that defendant's pants were wet. Id. at 119.

Officer Rivera–Báez testified that while standing next to the patrol car, he had asked defendant whether he carried any identification, to which he responded affirmatively. Id. at 141. However, according to Officer Rivera–Báez's own account, defendant never had a chance to show him his identification, first, because he was handcuffed; and second, because at that point in time, the U.S. Customs Service agents arrived, and, upon noticing that

---

11. Officer Rivera–Báez had not been informed that the suspects at large were armed **(Docket # 72, at 152, 155–56).** He claimed, however, that "whenever you conduct an intervention, you have to assume that ... [the people you intervene with] could be armed." Id. at 156.

12. "Yawl" was the English translation used at the hearing for the Spanish word "yola,"

meaning a small boat commonly used by immigrants sailing from the Dominican Republic into Puerto Rico.

13. Responding to a question posed by the Court, Officer Rivera–Báez testified that no such drowning had occurred in the Guayama coast around that time **(Docket # 72, at 167).**

defendant was wet and muddy, instructed Officers Rivera–Báez and Pérez to transport him to the Maritime Unit. Id. at 141–42, 167; **Docket # 74, at 414.** Thus, while Officer Rivera–Báez "saw" defendant's identification at the Pozuelo area, it was not until after they arrived at the Maritime Unit, that he actually examined and "read" the identification **(Docket # 74, at 407, 415).** Defendant's detention did not last more than fifteen minutes. Id. at 412.

At the suppression hearing, Officer Rivera–Báez testified twice. The first time he did so, he was examined and cross-examined at length about what had transpired at the Pozuelo area next to the patrol car. During his testimony, Officer Rivera–Báez never mentioned having asked defendant his name **(Docket # 72, at 116–49, 165–68).** The Court later allowed the government to reopen Officer Rivera's direct examination **(Docket # 74, at 401–06).** This time, Officer Rivera–Báez testified that the "first question ... [that he] asked ... [defendant] as soon as ... [he] stood ... him up beside the patrol car," was his name, to which defendant responded: "Alberto Ramón." Id. at 406–07. Whatever the explanation for Officer Rivera–Báez's failure to initially mention that he had asked for defendant's name, it was clearly established at the hearing (1) that defendant told his real name, id. at 416; and (2) that Officer Rivera–Báez never had a chance to corroborate this information at the Pozuelo area. Id. at 414–15.

After his arrest, defendant was transported to the Maritime Unit. He was subsequently taken to the U.S. Customs Service facility in San Juan, where he was interviewed by a U.S. Customs Service agent. During this interview, defendant made certain incriminatory statements **(Docket # 74, at 484, 489–91).**

It should be noted that once at the Maritime Unit in Guayama, defendants Mora–Cabrera, Vélez–Saldaña, and Ramón voluntarily allowed their clothes to be sub-jected to a sniff test by James Patrick, a PRPD narcotics-detecting dog. James Patrick alerted to defendants' clothes, positively indicating the presence of drugs **(Docket # 73, 181–208).** However, this information having been obtained after defendants were already under arrest, it "may not form the basis of probable cause for that arrest." *See Bizier,* 111 F.3d at 217.

### Intervention with Defendant José A. Cedeño–Castillo

Early in the morning of March 29, PRPD Officer Héctor M. Díaz and Sergeant Francisco Solis were patrolling the Guayama area when they heard a radio broadcast that forty-two bales of controlled substances had been seized in Los Limones, and that some suspects were at large **(Docket # 73, at 296–97).** They drove to the area where they met a U.S. Customs Service agent who provided a description of "an individual who had gone into ... the brush somewhere around the Santa Ana ... sector," id. at 298. The agent described this individual as brown-skinned, bearded, and wearing a long-sleeved checkered shirt and dark pants. Id. The agent did not indicate whether this individual was connected or not·to the drug seizure. Id. at 312. An almost identical description of an individual seen around Santa Ana was subsequently received over the radio by Officer Díaz and Sergeant Solis. The individual was now additionally described as being wet; and his shirt was further described as a long-sleeved, *gold-colored,* checkered shirt. Id. at 310. More importantly, however, it was informed that this individual was "related to the arrest that had been done earlier." [14] Id. at 311.

Pursuant to this information, Officer Díaz and Sergeant Solis went over to Santa Ana. Id. at 298. Santa Ana is a residential area with some abandoned uninhabited houses located in Puente Jobos, near the

---

**14.** By this time, defendants Mora–Cabrera and Vélez–Saldaña had been arrested. Defendant Ramón was almost simultaneously being detained.

Pozuelo area. Id. at 298, 313. According to Officer Díaz, once there,[15] they noted that the gate of one of the abandoned houses was ajar. They decided to go inside, at which time they noticed that door leading into the house was also open. Id. at 298. They entered with their weapons drawn since, according to Officer Díaz, this particular house was considered a "high risk area," because it was "used … [by] people who are users of controlled substances." Id. Officer Díaz testified that although he and Sergeant Solis were the only law enforcement officials who entered the house, the "guys from Customs" were outside to assist them. Id. at 314. A police helicopter was also outside. Id.

In one of the rooms, Officer Díaz and Sergeant Solis found defendant Cedeño–Castillo "lying face down on [a mattress] on the floor." Id. at 299; **Docket # 74, at 336.** Officer Díaz asked him to identify himself, but he remained silent (**Docket # 73, at 299**). Sergeant Solis then asked defendant what he was doing there, and he said that he lived there with his brother. Id. On the floor, next to where defendant lay, Officer Díaz was able to see a gold-colored checkered shirt, a razor blade, and some hair. Id.[16] At that time, defendant stood up, and allegedly stated: "Listen, cops, don't search anymore because I'm the one that you are looking for." Id. Upon hearing this, Officer Díaz, who until then had been pointing at defendant with his gun, immediately placed him under arrest; read him his rights; and patted him down. Id. Only a black wallet was obtained from him. Id. When asked whether he understood the rights read to him, defendant remained silent. Id. at 300, 316. He was then transported to the Maritime Unit. Id. at 301. At the Unit, Officer Díaz transferred custody over de-

fendant to Agent José A. Pérez. Id. at 301; **Docket # 74, at 331.** Defendant, however, remained inside the car in which he was transported, with Officer Díaz outside guarding him (**Docket # 73, at 331**).

At about 11:15 a.m., U.S. Customs Service Agent Ramón E. Salgado, who was on duty at the Maritime Unit, was approached by Agent Pérez. Agent Pérez informed him that defendant had been apprehended, and that he wanted to "volunteer some information" (**Docket # 74, at 363**). Agent Salgado went over to where defendant was being held, and after Officer Díaz relayed what had occurred during the intervention, he stepped inside the car, leaving the door open. Id. at 332, 364. Officer Díaz remained to take notes while Agent Salgado asked defendant his biographical information, i.e., his name, his age, where he was from, where did he live, etc., id. at 347; **Docket # 73, at 302**, and then he left.[17] **Docket # 74, at 333.**

Once Officer Díaz had left, Agent Salgado closed the car's door and read defendant his constitutional rights in Spanish, which defendant now said he understood. Id. at 364–66. Agent Salgado asked defendant if he wanted to waive these rights, and he said yes. Id. at 366. He then pulled a piece of paper from his notepad and drafted a brief statement which defendant signed. This statement reads: "I, José Altagracia Cedeño understand my rights that were read to me on March 29th, 1998, at 11:47 a.m., today in the headquarters of the Maritime Unit, Puerto Rico Police. I waive my right to an attorney and I wish or agree to make statements." Id. at 367; Government's Exhibit No. 16. Agent Salgado then interviewed defendant for about 40 minutes. Id. at

---

**15.** This was at about 10:00 a.m. (**Docket # 74, at 330**).

**16.** Officer Díaz also testified that he concluded that defendant had recently shaved, because "he had a lot of misses, you know, like when you shave in a hurry and you miss a lot of spots, like that." Id. at 299.

**17.** Between his arrival at the Maritime Unit and the moment when Agent Salgado approached him, defendant was not questioned (**Docket # 73, at 301**).

449. During the interview, defendant made some incriminating statements. He was later placed inside another vehicle and transported to the U.S. Customs Service facility in San Juan, where he was further interviewed by other agents. Id. at 450–53.

## Applicable Law

■ Interaction between law enforcement officials and citizens generally falls within three tiers of Fourth Amendment analysis, depending on the level of intrusion into an individual's privacy. *See United States v. Young,* 105 F.3d 1, 5 (1st Cir.1997). Falling within the first or lowest tier are minimally intrusive police engagements, such as approaching an individual in a public place to generally ask questions, or to ascertain the individual's identity. These engagements do not constitute a seizure for Fourth Amendment purposes, "so long as the officers do not convey a message that compliance with their request is required." *Florida v. Bostick,* 501 U.S. 429, 435, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). That is, "[s]o long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required. The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature." *Id.* at 2386 (citation omitted); *see also California v. Hodari D.,* 499 U.S. 621, 111 S.Ct. 1547, 1551, 113 L.Ed.2d 690 (1991) ("A person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.").

■ The second tier encompasses what is commonly know as an investigative or *Terry* stop.[18] An investigative or *Terry* stop "occurs when a police officer, acting on reasonable and articulable suspicion of criminal activity, briefly detains an individual to confirm or dispel his suspicion."

*Young,* 105 F.3d at 6 (citations omitted). This type of seizure will be found constitutionally permissible if the "officer's action was justified at its inception, and[] if ... the action taken was reasonably related in scope to the circumstances which justified the interference." *Id.* (citations omitted). It is irrelevant for this analysis whether the officer's action was grounded on probable cause. *See id.*

■ To meet the first prong of the investigative stop analysis—that is, whether the intrusion was justified at its inception—"'the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *Young,* 105 F.3d at 7 (quoting *United States v. Kimball,* 25 F.3d 1, 6 (1st Cir.1994)). In assessing whether the second prong is satisfied, the court must consider the totality of the circumstances surrounding the interference, including all the information gleaned by the intervening law enforcement official during the stop. *See id.; United States v. Owens,* 167 F.3d 739, 748 (1st Cir.1999).

■ The remaining tier of the Fourth Amendment analysis comprises *de facto* arrests, requiring probable cause. *See Young,* 105 F.3d at 6. "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts, and as such must be evaluated in light of the totality of circumstances." *United States v. Martinez–Molina,* 64 F.3d 719, 726 (1st Cir.1995) (internal quotation marks omitted) (quoting *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) and *United States v. Torres–Maldonado,* 14 F.3d 95, 105 (1st Cir.1994)). In order to establish probable cause the government "need not present the quantity of proof necessary to convict. Rather, it need only show that at the time of the arrest, the facts and circumstances known to the arresting officers were sufficient to warrant a prudent person in be-

---

**18.** After *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

lieving that the defendant had committed or was committing a crime." *Id.* (citations omitted); *see also United States v. Bizier,* 111 F.3d at 217. "The inquiry into probable cause to arrest focuses," therefore, "on what the officer knew at the time of the arrest." *United States v. Brown,* 169 F.3d 89, 91 (1st Cir.1999).

■ While there is no "scientifically precise formula" to determine whether any particular mode of detention amounts to a *de facto* arrest, *United States v. Taylor,* 162 F.3d 12, 21 (1st Cir.1998) (citation omitted); *see also United States v. Acosta–Colon,* 157 F.3d 9, 14 (1st Cir.1998) (no "litmus-paper test") (citation omitted), an investigative stop is ordinarily deemed a *de facto* arrest "when a reasonable man in the suspect's position would have understood his situation, in the circumstances then obtaining, to be tantamount to being under arrest." *Young,* 105 F.3d at 7 (citations and internal quotation marks omitted). "A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing." *United States v. Owens,* 167 F.3d 739, 749 (1st Cir.1999) (quoting *United States v. Sharpe,* 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985)).

Yet some cases require a more fact-specific inquiry. As the First Circuit has explained:

[I]n a typical borderline case, *e.g.,* one in which the detention at issue has one or two arrest-like features but otherwise is arguably consistent with a *Terry* stop, it will not be obvious just how the deten-tion at issue ought reasonably to have been perceived; indeed, this will be the central point of contention. Thus, in such a case—that is, where the detention is distinguishable from, yet has some features normally associated with, an arrest—the analysis must revert to an examination of whether the particular arrest-like measures implemented can nevertheless be reconciled with the limited nature of a *Terry*-type stop. This assessment requires a fact-specific inquiry into whether the measures used were reasonable in light of the circumstances that prompted the stop or the developed during its course.

*Acosta–Colon,* 157 F.3d at 15. Against this doctrinal background, we analyze the intervention to which each of the defendants was subjected.

## Analysis

### Intervention with Defendant Mora–Cabrera

■ At the time when he first encountered defendant Mora–Cabrera, Sergeant Rodríguez knew (1) that a large amount of drugs found inside a van had been seized earlier that morning in the Pozuelo area, and (2) that an individual dressed in dark pants had come out of that van.[19] When spotted by Sergeant Rodríguez, defendant Mora–Cabrera was wearing dark pants. He was walking at 3:15 a.m., on a Sunday, through an isolated mangrove area near the site of the seizure, and only a few hours after it had taken place **(Docket # 72, at 40, 65).** Apparently at the sight

---

19. "Under the 'fellow-officer' rule, law enforcement officials cooperating in an investigation are entitled to rely upon each other's knowledge of facts when forming the conclusion that a suspect has committed or is committing a crime." *United States v. Meade,* 110 F.3d 190, 193 (1st Cir.1997). While Sergeant Rodríguez testified to having been informed about the intervention with the van in the Pozuelo area, he did not mention having been told that a large amount of cocaine was found inside it. At the hearing, however, the prose-cutor did not specifically examine Sergeant Rodríguez's knowledge of this particular fact, nor did defense counsel challenged it. Notwithstanding, "where law enforcement authorities are cooperating in an investigation," as it happened in this case, "the knowledge of one is presumed shared by all." *Illinois v. Andreas,* 463 U.S. 765, 771 n. 5, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983). Therefore, we shall assume that PRPD Officer Rivera in fact told Sergeant Rodríguez that the van seized was found to contain a large amount of drugs.

of police, he started to run and went hiding into the mangroves.

While in a different setting the fact that defendant was wearing dark pants may have been meaningless, in this case, time and place combining, it was enough to lead Sergeant Rodríguez to reasonably suspect that defendant was the individual who had escaped the van and, therefore, connected to the drug shipment. Defendant's flight took this suspicion to a higher level. Thus, by the time Sergeant Rodríguez and Agent Morales found and apprehended defendant, Sergeant Rodríguez already had probable cause to arrest him, believing that he had committed a drug-trafficking offense. *See* 2 Wayne R. LaFave, *Search and Seizure* § 3.6(e), at 324 (3d ed. 1996) ("[I]f there already exists a significant degree of suspicion concerning a particular person, the flight of that individual upon the approach of the police may be taken into account and may well elevate the preexisting suspicion up to the requisite Fourth Amendment level of probable cause."); *cf. Martinez–Molina,* 64 F.3d at 729 n. 8 ("[F]light at the approach of law enforcement officers, when coupled with specific knowledge relating to evidence of a crime, is a proper factor to be considered in the decision to make an arrest.") (citations omitted); *United States v. Sealey,* 30 F.3d 7, 10 n. 2 (1st Cir.1994) (probable cause to arrest for violation of firearms law found where suspect fled from police for no apparent reason and was observed discarding a gun during the ensuing chase); *United States v. Miller,* 589 F.2d 1117, 1129 (1st Cir.1978) ("The importance of flight or other behavior signifying guilt as a final link in a chain of probable cause is underscored in a number of cases."), *cert. denied,* 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979).

Since the requisite probable cause existed, defendant's subsequent arrest was lawful, and his contemporary and voluntarily uttered statements to the effect "that he was hungry, that he had been lost for 11 days, and that he had come from Santo Domingo with several others," [20] (**Docket # 72, at 42),** cannot be considered "poisonous fruit." [21] *New York v. Class,* 475 U.S. 106, 116, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986) ("The Fourth Amendment by its terms prohibits 'unreasonable' searches and seizures."). Defendant's statements, moreover, cannot be considered obtained in violation of *Miranda,* because they were not prompted by official interrogation, or any functional equivalent. *See, e.g., United States v. Shea,* 150 F.3d 44, 48 (1st Cir.1998); *United States v. Ventura,* 85 F.3d 708, 711 (1st Cir.1996); *United States v. Rogers,* 41 F.3d 25, 31 (1st Cir.1994).

### Intervention with Defendant Vélez–Saldaña

Approximately eight hours after the drug load was seized, Officers Guzmán and Meléndez spotted defendant Vélez–Saldaña coming out of the mangrove in Los Limones. Officers Guzmán and Meléndez decided to engage defendant because they thought him a stranger. Both officers stepped out of their vehicle, and Officer Meléndez directed defendant to stop, which he did. Thereupon, Officer Meléndez began questioning him. Defendant argues that the officers lacked the requisite level of suspicion to stop him. Alternatively, he argues that even assuming that such level of suspicion existed, his detention, under the circumstances, constituted a *de facto* arrest unsupported by probable cause. The government counters that the officers' intervention with defendant fell within the contours of a permissible *Terry* stop.

---

**20.** Based on these statements and lack of identification, Officer Rodríguez further obtained probable cause to arrest defendant also for being illegally in the United States.

**21.** Defendant Mora–Cabrera does not challenge the admissibility of the statements given at the U.S. Customs facility in San Juan. Therefore, we refrain from addressing this issue.

The government concedes that initial encounter between the police and defendant Vélez–Saldaña was a *Terry* stop (**Docket # 87, at 18**). Therefore, we proceed under the assumption that defendant's initial detention constituted a seizure for Fourth Amendment purposes. Our analysis hinges, therefore, on whether this seizure was valid—that is, whether the officers action "was justified at its inception, and, if so, whether the action taken was reasonably related in scope to the circumstances which justified the interference." *Young*, 105 F.3d at 6 (citations omitted).

■ The Supreme Court has recognized that "[a]rticulating precisely what 'reasonable suspicion' ... mean[s] is not possible." *Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). Reasonable suspicion is "a commonsense, non-technical conception[ ] that deal[s] with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* (citations and internal quotations omitted). *See also United States v. Sowers*, 136 F.3d 24, 27 (1st Cir.1998) (applying a "down-to-earth" approach in assessing reasonable suspicion). Under this practical, commonsense approach, we find that Officers Guzmán and Meléndez's intervention with defendant was justified at its inception. First, defendant was seen alone coming out of an isolated, non-residential, mangrove area in Los Limones. Second, at that time, the officers knew that a load of forty-two bales of cocaine had been recently seized in Los Limones. Third, defendant did not look familiar. Particularly, Officer Guzmán's unchallenged testimony at the suppression hearing was that Pozuelo is an area with a very small population, and that in the two years that he had been working there, he had never seen defendant before. It would not be unreasonable to infer that a person unfamiliar to such an area—isolated and encompassing mostly mangroves—, who had participated in a criminal activity involving a considerably large amount of drugs, would have been still lurking around a few hours after the police had nearly caught him.[22]

■ The second prong of the investigative-stop test was also met in this case. The actions subsequently taken by Officers Guzmán and Meléndez were reasonably related in scope to the circumstances which justified their interference with defendant. The officers parked their vehicle next to defendant, and stepped out to interview him. Neither officer drew out his gun.[23] Officer Guzmán told defendant to stop and asked him some questions. These questions were brief and not framed as to elicit any incriminatory answers.[24]

22. This inference can be drawn from all the facts confronting the officers at the time they stopped defendant Vélez–Saldaña, notwithstanding the officers' failure to particularly articulate it at the suppression hearing. "[T]he fact that [an] officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Ohio v. Robinette*, 519 U.S. 33, 117 S.Ct. 417, 420–21, 136 L.Ed.2d 347 (1996) (quoting *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996).) *See also* 4 Wayne R. LaFave, *Search and Seizure* § 9.4(a), at 139 (3d ed.1996) (reason able-and-articulable-suspicion test "is *purely* objective and thus there is no requirement that an actual suspicion by the officer be shown") (footnote omitted); *State v. Hawley*, 540 N.W.2d 390, 392 (N.D.1995) (reasonable suspicion found even though officer admitted that "he did not form any suspicions of criminal activity").

23. The First Circuit has noted that "[t]he use of guns and the presence of more than one police officer ... do not necessarily convert an investigative stop into an arrest." *See, e.g. Young*, 105 F.3d at 8. In the present case, neither officer used his gun. The only evidence presented at the hearing was that Officer Meléndez was merely carrying his.

24. *See United States v. Quinn*, 815 F.2d 153, 157 (1st Cir.1987) (question relating to defendant's presence in a certain area determined not to transform investigatory stop into a *de facto* arrest); *United States v. Fernandez Santana*, 975 F.Supp. 135, 142 (D.P.R.1997) (same).

Defendant was not handcuffed and was never told he was under arrest.[25] Moreover, the entire encounter with defendant, including the time it took to place him under arrest, did not last more than fifteen minutes.[26] A reasonable person in defendant's position would not have understood his situation, viewed from the totality of the circumstances, "to be tantamount to being under arrest." [27] *See Young*, 105 F.3d at 7.

 The information gleaned by Officers Guzmán and Meléndez, including their first-hand observations while conducting defendant's interview, gave them probable cause to believe that he was connected to the seized drugs. First, defendant initially refused to give his name. Second, he could not satisfactorily explain his presence in the area. Third, he provided implausible information regarding the time it took him to get to where he was when he was detained.[28] Fourth, he appeared to be

agitated and excited.[29] Fifth, his clothes were dirty; he had mangrove root residue on his shirt, and the lower portion of his pants was wet. Under these circumstances, a reasonably prudent person in Officers Guzmán and Meléndez's position would have been entitled to believe that defendant was one of the individuals who had been involved in the incident with the van that morning.[30]

## Intervention with Defendant Ramón

 Defendant Ramón was spotted near the area where the drug seizure took place while he was crossing the street and walking inside a bakery, his clothes matching the description which Officers Rivera–Báez and Pérez had of one of the suspects involved in the drug incident. This was enough to give rise to the reasonable suspicion necessary to detain him for investigation. Moreover, as Officer Rivera–Báez

**25.** *See United States v. Taylor*, 162 F.3d 12, 22 (1st Cir.1998) (noting, in assessing whether detention was a permissible *Terry* stop, that defendant was not handcuffed); *United States v. McCarthy*, 77 F.3d 522, 532 (1st Cir.) (same), *cert. denied*, 519 U.S. 991, 117 S.Ct. 479, 136 L.Ed.2d 374 (1996); *Young*, 105 F.3d at 8 (noting, in making *de facto* arrest inquiry, that law enforcement officers never told defendant he was under arrest or that they wanted to arrest him).

**26.** *See Young*, 105 F.3d at 7 (one factor to consider in determining whether an investigatory stop has transformed into a *de facto* arrest, if whether the stop extended "beyond the time necessary to confirm or dispel reasonable suspicion").

**27.** While defendant was not told hat he was free to leave **(Docket # 73, at 247–48)**, this fact has no bearing on our assessment, since, by the same token, he was never told that he was *not* free to do so. *See Taylor*, 162 F.3d at 22 (noting, in assessing whether defendant was *de facto* under arrest, that he was never told that he was not free to leave). Similarly, the fact that Officer Guzmán testified at the suppression hearing that had defendant attempted to flee, they "would have told him to halt[,] ... [they] would have detained him," **(Docket # 73, at 248)**, should not be factored in our analysis. " '[T]he subjective intent of the officers is relevant to an assessment of the

Fourth Amendment implications of police conduct only to the extent that that intent has been conveyed to the person confronted.' " *Cardoza*, 129 F.3d at 16 n. 6 (quoting *Michigan v. Chesternut*, 486 U.S. 567, 575 n. 7, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988)). There was no evidence presented at the hearing to establish that Officer Guzmán conveyed his subjective intention to defendant.

**28.** *See* 2 Wayne R. LaFave, *Search and Seizure* § 3.6(f), at 327–28 (1996) ("[R]esponses by the suspect which the officer knows to be false, or which are implausible, conflicting, evasive or unresponsive may well constitute probable cause when considered together with the prior suspicions.").

**29.** *See United States v. Brown*, 457 F.2d 731, 733 (1st Cir.) (noting, in assessing whether probable cause existed, that defendant "appeared nervous"), *cert. denied*, 409 U.S. 843, 93 S.Ct. 42, 34 L.Ed.2d 82 (1972).

**30.** Defendant Vélez–Saldaña seeks also to suppress the seized cocaine **(Docket # 51, at ¶ 16)**. However, he lacks the requisite standing. He has failed to establish that he harbored any reasonable expectation of privacy over the cocaine by failing to "demonstrate a sufficiently close connection" to it. *United States v. Lewis*, 40 F.3d 1325, 1333 (1st Cir. 1994).

was entering the bakery to engage defendant, he noticed that he was muddy and wet. It would have been reasonable to infer, as Officer Rivera–Báez did, that since "the place where the drugs were offloaded was a mangrove [area,] ... [defendant] would have gotten muddy" trying to get away (**Docket # 72, at 166**). The facts known to Officer Rivera–Báez at the time he handcuffed defendant, together with the rational inferences from those facts, were enough to lead a prudent person to believe that defendant was connected to the drug load. Thus, regardless of whether defendant's detention inside the bakery constituted a *de facto* arrest, it was supported by probable cause.[31] The existence of probable cause to arrest notwithstanding, we must inquire whether defendant's un-Mirandized statements should be suppressed. *See Ventura*, 85 F.3d at 712 (holding that the existence of probable cause is not relevant to a *Miranda* inquiry).

"*Miranda* warnings must be given before a suspect is subjected to custodial interrogation. The custodial interrogation inquiry necessarily demands determination of its two subsidiary components: 1) custody and 2) interrogation." *Id.* A person is said to be under "custody" when he or she is under formal arrest, or restrained "to the degree associated with a formal arrest." *Id.* (citations omitted). This is an *objective* test requiring only to determine how a reasonable person in the defendant's shoes would have understood his situation. *Id.* at 711. On the other hand, a person is said to be under interrogation when he or she is subjected to "express questioning," or to "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Id.* This test is also an objective one: "how would the officer's statements and conduct be perceived by a reasonable person in the same circumstances?" *Id.*

In this case, defendant Ramón was handcuffed while Officer Rivera–Báez required him to explain his presence in the area and his purpose for being there. The use of handcuffs is undoubtedly "one of the most recognizable indicia of a traditional arrest." *Acosta–Colon*, 157 F.3d at 18. While handcuffs may be permissibly used for safety and security reasons under certain rare situations within the context of a *Terry* stop, without transforming it into a *de facto* arrest, *cf. Acosta–Colon*, 157 F.3d at 17, for purposes of *Miranda*, however, we feel that, in this case, a reasonable person in defendant Ramón's shoes would have understood his situation as being comparable to an arrest. Moreover, Officer Rivera–Báez's express questions clearly constituted interrogation. We find, therefore, that defendant was subjected to custodial interrogation necessitating *Miranda* warnings. Accordingly, defendant's statements in response to Officer Rivera–Báez's questions should be, and are hereby, suppressed.

### Intervention with Defendant Cedeño–Castillo

█ Defendant Cedeño–Castillo was arrested in an abandoned house after voluntarily telling Officer Díaz and Sergeant Solis: "Listen, cops, don't search anymore because I'm the one that you are looking for" (**Docket # 73, at 299**). At that time, the officers had a detailed description of defendant, who, as they knew, was sought both by the police and the U.S. Customs Service, in connection with a certain arrest which had taken place earlier that day. The description was of a brown-skinned, bearded man, wearing a long-sleeved, gold-colored, checkered shirt, and black pants. Officers Díaz and Sergeant Solis went over to the area were defendant was seen. They entered with their weapons drawn into an abandoned house which they considered a dangerous place because of its frequent use by drug addicts, and found defendant laying on the floor in a room.

---

**31.** The fact that defendant was later placed formally under arrest is of no importance, since by then he was, for Fourth Amendment purposes, already lawfully under arrest.

At that time, Officer Díaz was able to see a gold-colored checkered shirt on the floor next to defendant. He also noticed a razor blade and some hair. From defendant's facial appearance, Officer Díaz concluded that he had shaved recently. Defendant did not identify himself at the request of Sergeant Solis, although he answered, in response to Sergeant Solis's questioning, that he lived there with his brother. Notwithstanding, defendant immediately told the agents not to look any further because he was the person that they were looking for. Following this statement, defendant was placed under arrest and read his *Miranda* rights, which he did not acknowledge to understand.

Defendant claims that there was no probable cause for his arrest. He challenges that he "was arrested at once without being interrogated[; that] [h]is statement was unintelligible and could not serve as a basis for his arrest[; that] [t]here was no evidence linking ... [him] to the drug seizure, or that ... [he] had weapons or was using drugs" (**Docket 78, at 22**). He contends, moreover, that he did not "attempt to flee or struggle when the officers approached and arrested him." Id.

■ At the outset, we note that defendant does not challenge the officers' right to be in the house where he was arrested, nor does he claim to have had any reasonable expectation of privacy in it. Therefore, we shall proceed under the assumption that the officers' search of the abandoned premises was reasonable, and thus not did not violate the Fourth Amendment.[32] Furthermore, we find that, under the circumstances, there was ample probable cause to arrest him. Officer Díaz and Sergeant Solis, acting pursuant to information that a suspect sought by the police was in the area, went into the abandoned house to investigate. There they found defendant fitting the suspect's description. They asked him a few general questions, and he voluntarily stated that he was the person that they were looking for.

In his brief, defendant notes that the officers lacked information about defendant's relation to the drug seizure. This is of no consequence under the circumstances. Regardless of what defendant was being sought for, Officer Díaz and Sergeant Solis knew that the police and the U.S. Customs Service were looking for him in relation to a certain arrest. Any reasonable person in this situation would have inferred that defendant was being sought for his involvement in some kind of criminal activity, insufficient description of such activity notwithstanding.

■ Moreover, defendant argues that his detention exceeded the parameters of a permissible *Terry* stop. We fail to see how could the encounter between the police and defendant may be construed as an investigative stop. He was simply not detained. He was found inside an abandoned house and asked his name and his purpose for being there. After refusing to identify himself and failingly attempting to convince the officers that he lived there with his brother, he voluntarily stated that he was the individual that the officers were looking for. Defendant was not coerced into admitting to this. The officers' use of their weapons at that time was justified since they knew that that particular house was frequented by drug addicts, and was thus considered a dangerous place. Therefore, he was lawfully placed under arrest.

Furthermore, defendant's incriminatory statements given at the Guayama Maritime Unit should not be suppressed. While defendant did not appear to understand his constitutional rights when these were first read to him at the time of his arrest, he was Mirandized a second time

---

**32.** Cf. *United States v. Garcilazo–Martinez,* 881 F.Supp. 265 (S.D.Texas 1994) (upholding arrest of defendant in an abandoned house where police had entered without a warrant).

before being questioned.[33] This time, defendant positively acknowledged to understand his rights and voluntarily agreed to make a statement.

A suspect may waive his *Miranda* rights, "provided the waiver is made voluntarily, knowingly and intelligently." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (citation omitted).

> The inquiry has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

*Id.* (citations and internal quotations omitted). The government "need prove waiver only by a preponderance of the evidence." *Colorado v. Connelly*, 479 U.S. 157, 168, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (citations omitted).

We find that, in this case, the government carried this burden. It was established at the suppression hearing that before being questioned, defendant was read his constitutional rights in Spanish, which defendant said he understood. Moreover, defendant was expressly asked whether he wanted to waive these rights, and he said yes. Finally, the interrogating officer secured a written waiver from defendant. This evidence was not challenged at the hearing.[34]

---

**33.** The questions asked him at the Maritime Unit before he was read again his rights fall within the booking exception established in *Pennsylvania v. Muniz*, 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990), and did not constitute interrogation for purposes of *Miranda.* *See also Shea,* 150 F.3d at 48.

## Conclusion

For the foregoing reasons, defendants' Angel Mora–Cabrera, Edgardo Vélez–Saldaña and José A. Cedeño–Castillo's motions to suppress (**Dockets # 51 and # 57**) are hereby **DENIED.** Defendant Alberto Ramón's motion to suppress is granted as to his un-Mirandized statements, and denied as to the remaining contentions. Accordingly, his motion (**Docket # 53**) is **GRANTED IN PART and DENIED IN PART.**

SO ORDERED.

---

**34.** For the same reasons, defendant Alberto Ramón's statements at the U.S. Customs Service facility in San Juan should not be suppressed.